Whaley, Judge,
delivered the opinion of the court:
This action is brought under the authority of a special' Jurisdictional Act approved April 25, 1932, which confers upon this court jurisdiction to hear and determine “all legal and equitable claims arising or growing out of any treaty or agreement between the United States and the Cherokee Indians, or arising or growing out of any Act of Congress in relation to Indian affairs, which the said Eastern or Emigrant Cherokees or Western or Old Settler Cherokees may have against the United States, which claims have not heretofore been determined and adjudicated on their merits by the Court of Claims or the Supreme Court of the United; States and paid in full” (47 Stat. 137).
*463 Plaintiffs seek to recover the value of lands lying in New Mexico, Texas, and the Indian Territory west of the 100th degree west longitude, claiming that this land was conveyed to the plaintiffs in what is known as the Cherokee “Perpetual Outlet West,” and this ownership was created by treaties, agreements, or acts of Congress.
Prior to 1811 the United States were very anxious to have the Cherokee Indians, who resided east of the Mississippi Eiver, move west of the Mississippi Eiver, and in 1811 a treaty was entered into whereby lands west of the Mississippi Eiver were exchanged for lands east of the Mississippi Eiver. This treaty was not proclaimed until 1819 (7 Stat. 195). During 1818 the President of the United States and the Secretary of War expressed the desire to grant to these Indians an outlet west so as to provide additional hunting grounds. This was in the nature of an inducement to these Indians for their removal from the east to the west of the Mississippi River. However, in 1819, prior to the treaty with the Cherokee Indians, a treaty was negotiated between the United States and Spain in which the western boundary of the United States was fixed at the 100th degree west longitude and the United States ceded to Spain all its right, title, and interest to the territory lying west and south of that longitude. This treaty was ratified in February 1821 (8 Stat. 252).
The Mexican provinces federated and established their independence from Spain in 1824 and created the United Mexican States and became possessed of all the lands ceded to Spain by the United States under the treaty of 1821. In 1828 the United States and the United Mexican States entered into a treaty in which the western boundary line of the United States of America was fixed at the 100th degree of west longitude. In this treaty reference is made to the treaty with Spain in 1819-1821 and the limits so fixed in that treaty were confirmed and validated by this treaty (8 Stat. 372).
The Cherokee Indians west of the Mississippi Eiyer entered into a treaty with the United States in May 1828' whereby the lands occupied by them in the State of Arkansas were exchanged for 7,000,000 acres of land further west *464 and in addition, the United States granted an outlet west “as far west as the sovereignty of the United States and their right of soil extend” (7 Stat. 311). This is the first time in any treaty with the Cherokee Indians that mention is made of an outlet west and it is stated in the preamble that “this outlet is in conformity with the pledges given by the President of the United States and the Secretary of War in 1818.” In 1833 the United States and the Cherokees entered into a treaty fixing the boundaries of the T,000,000 acres and again it is stated that the United States guarantee to the Cherokee Nation a “perpetual outlet west, and a free and unmolested use of all the country lying west of the western boundary of said seven millions of acres, as far west as the sovereignty of the United States and their right of soil extend” (7 Stat. 414). At that time the United States did not have sovereignty or the right of soil beyond the 100th degree of longitude as fixed in the treaty with Spain and subsequently affirmed and restated in its treaty with the United Mexican States. Both of these treaties were made with the Western or Old Settler Cherokees but it will be seen, as we progress, that the Eastern or Emigrant Cherokees became parties to both the treaties of 1828 and 1833 by the treaty of 1846 (9 Stat. 871).
In 1835 a ti’eaty was entered into between the Cherokee Indians and the United States whereby the latter ceded an additional tract of 800,000 acres to the Cherokees and agreed that a patent should issue for the said 800,000 acres and also for the 7,000,000 acres heretofore ceded as well as the outlet (7 Stat. 478).
The Kepublic of Texas declared and gained its independence from the United Mexican States in 1836 and a treaty was entered into between the United States and the Eepublic of Texas (8 Stat. 511) wherein it is recited that the limits of the two countries shall be that fixed in the treaty between the United Mexican States and the United States of America under the treaty of January 12, 1828 (8 Stat. 372). This was the treaty between the United States and the United Mexican States which fixed the limits of the boundary of the respective countries to that named in the treaty with Spain in 1821 (8 Stat. 252) and the boundaries in that treaty were fixed at the 100th degree of west longitude.
*465 A patent was issued and recorded in the General Land Office in December 1838 whereby the United States conveyed to the Cherokee Nation some 14,000,000 acres of land and it is recited in the preamble that the conveyance' is made in consideration of the promises made in the treaties of 1828, 1833, and 1835. This patent covers not only the 7,000,000 acres and the 800,000 acres but also the outlet which is described by metes and bounds. It is stated in this patent that the western line is fixed at a “line dividing the territory of the United States from that of Mexico.” (Sen. Ex. Doc. No. 124, 46th Cong., 2d Sess., Cong. Doc. Series 1885.)
The Republic of Texas was admitted into the Union as a State in 1845. (9 Stat. 108; 5 Stat. 797.)
Controversies having arisen between the Cherokees west of the Mississippi River, known as the Old Settlers, and those east of the Mississippi, known as the Emigrant Cherokees, with respect to the ownership of the various tracts of land and their interest therein, a treaty was entered into in 1846 whereby it was agreed that the lands occupied by the Cherokee Nation should be for the common use and benefit of the whole Cherokee people.
In 1850 the United States and the State of Texas fixed the northern and western boundary lines between the United States and Texas and in this agreement Texas relinquished all territory exterior to said boundaries and out of this was established the territory of New Mexico (9 Stat. 446).
By a treaty between the Cherokee Nation of Indians and the United States in 1866, the right to settle friendly Indians on a part of the Cherokee country west of the 96th degree of west longitude was given to the United States. There is also contained in this treaty the conveyance in trust to the United States of the tract of 800,000 acres known as the Cherokee Neutral Land and also the narrow strip, being that portion of the outlet lands in the State of Kansas, which is sometimes called the “Cherokee Strip” (14 Stat. 799).
Congress passed an act in 1889 providing for the creation of a Commission to negotiate with the Cherokee Indians and all other Indians owning or claiming lands west of the 96th degree of longitude in the Indian Territory for *466 the cession of their title, claim, and interest of every kind and character to the United States. Acting under this authority, negotiations were had with the Cherokee Nation, and in 1891 a final adjustment was agreed upon whereby the Cherokee Nation ceded all its lands west of the 96th degree west longitude (Sen. Ex. Doc. 56, 52nd Cong., 1st Sess., p. 28, Cong. Doc. Series 2900) and in 1898 Congress ratified the agreement whereby these lands were ceded to the United States. (29 Stat. 612, 640.) This agreement concerning the Cherokee outlet provided under Article I that the Cherokee Nation conveyed all its right, title, and interest of every kind and character to that part of the Indian Territory bounded on the west by the 100th degree west longitude and on the east by the 96th degree west longitude. It was stated in the agreement that some eight million and odd acres were contained therein. The United States paid for these lands some ten million dollars. The Cherokee Indians have not possessed any lands west of the 100th degree west longitude and the outlet, which was mentioned in the patent and described therein, was that outlet which is covered by the Cherokee Outlet agreement of 1898 and for which the Government paid an adequate consideration for its cession (25 Stat. 980,1005).
The contention of the plaintiffs in this suit is that the President of the United States, through his Secretary of War, in 1818 made a promise to these Indians of a perpetual outlet west as an inducement to them to move from the east to the west of the Mississippi River. Although these promises had been held out to the Indians by the Secretary of War, nevertheless Congress did not grant an outlet in any treaty until 1828 and in this treaty the outlet is fixed as far as the sovereignty of the United States and their right of soil extend. At that time the right of soil and sovereignty of the United States did not extend beyond the 100th degree of west longitude as fixed in the treaty with Spain in 1821.
The plaintiffs contend that President Monroe, having in 1823 proclaimed the “Monroe Doctrine,” whereby it was asserted that the North and South American continents were no longer open to colonization by a European power, the *467 treaty with Spain in 1821 was nudvm factwn and Spain never entered into possession and took sovereignty and right of soil in the lands ceded by the United States. It has been so well established that treaties entered into between nations are political and not judicial questions and courts can not declare a treaty fraudulent or nonelfective, that it is unnecessary to cite authorities. It is purely a matter for the political and not the judicial branch of the Government. The courts have to consider treaties as valid and binding. See United States v. Old Settlers, 148 U. S. 468. However, both in the treaty with the United Mexican States after they declared their independence from Spain and also in the treaty between the United States and the Republic of Texas, the treaty with Spain of 1821 was recognized by the United States.
A similar question arose in the case of the United States v. Choctaw Nations, 179 U. S. 494, 509, and the court stated:
It is an important fact in this connection that prior to the treaty of 1830 the United States of America and the United Mexican States, by the treaty between them of January 12, 1828, recognized the boundaries of the respective countries to be as fixed by the treaty of 1819-1821 (8 Stat. 372, 374). And this position was maintained; for by a treaty concluded in 1838 between the United States and the Republic of Texas, the latter recognized as binding upon it the treaty made in 1828 with the United Mexican States. Treaties and Conventions (1776-1887), p. 1079. And in the settlement made in 1850 between the United States and the State of Texas the latter agreed that its boundary on the north should commence at the point at which the meñdian of 100 degrees west from Greenwich is intersected by the parallel of 36°30' north latitude, and run from that point west to the meridian 103 degrees west from Greenwich, then due south to the 32d degree of north latitude, thence on that parallel to the Rio Bravo del Norte, and thence with the channel of that river to the Gulf of Mexico (9 Stat. 446, c. 49; United States v. Texas, 162 U. S. 1, 39).
So it will be seen that, at the time the patent was granted, the limit of the western boundary of the United States was fixed at 100 degrees of west longitude and the United States did not possess any sovereignty or right of soil west of that *468 degree of longitude. The outlet mentioned in the. patent was that contained in the Indian Territory, and after the agreement of 1891, which was subsequently ratified in 1893, the Cherokee Indians conveyed for a valid and valuable consideration all their right, title, and interest to this outlet. Therefore, from that date, they have not possessed an outlet for which claim can be made against the United States.
Plaintiffs have no legal or equitable claim arising or growing out of any treaty or agreement or act of Congress which entitles them to compensation from the United States for which they have not been paid in full.
Plaintiffs’ petition is dismissed. It is so ordered.
Williams, Judge; Littleton, Judge; Ceben, Judge; and Booth, Chief Justice, concur.