LittletoN, Judge,
delivered the opinion of the court:
The Wichita Tribe and Affiliated Bands of Indians and the Caddo Band, claiming to be an affiliate of the Wichitas, seek to recover $10,642,640.75 with interest at 5 percent per annum as a part of just compensation from various dates for the alleged taking by the United States, for itself and for other tribes and bands of Indians, of certain lands, moneys, and other property. This total is made up of (1) $6,354,543.75, as a principal sum at $1.25 an acre for 5,083,635 acres of land in Oklahoma (including the area in “Greer County” of 1,511,576 acres), extending from the Cross Timbers, somewhat east of the 98th meridian to the west of the Wichita Mountains and Antelope Hills, to the 100th meridian in the present state of Oklahoma; from the Canadian Biver on the north to the Bed Biver on the south. The Wichita Beservation established and set apart in 1859 and 1872, otherwise known as District No. 5 in the “Leased District,” comprising 743,257.19 acres is not included in the area claimed. Out of this total acreage of 5,083,635 the United States at various times set aside for schools and other purposes, or allotted to or sold for the benefit of the Cheyenne and Arapahoe tribes, 3,082,900 acres, and for the benefit of the Comanche, Kiowa, and Apache tribes it has set apart, sold, allotted, or given for school and other purposes 2,489,159 acres; “Greer County,” of 1,511,576 acres, decreed by the Supreme Court to be a part of the United States, not *412 belonging to Texas, was subsequently opened for settlement at not less than $1.25 an acre; (2) $2,600,000 as the principal sum at 50 cents an acre for 5,200,000 acres of land in Texas from the Ned River on the north to the Brazos on the south and from the 98th meridian, a location somewhat west, on the average, of Cross Timbers in Texas to the 100th meridian on the west; (3) for loss of property in Texas in 1859 upon removal of the affiliated bands of the Wichita tribe and the Caddo Indians from that state to the “leased district” in Oklahoma; and (4) $1,648,091.38 for net oil receipts arising from Red River oil lands and leases, and credited, paid to or expended for the benefit of the Comanche, Kiowa, and Apache Indians, which receipts arose from lands set apart for or allotted to these Indians within the territory which the Wichitas claim they previously possessed, owned, and occupied.
Section 1 of the Jurisdictional Act of June 4, 1924 (43 Stat. 366), under which this suit was instituted, provides that all claims of whatsoever nature which the Wichita and affiliated bands of Indians in Oklahoma may have against the United States may be submitted to this court for determination of the amount, if any, due said tribes or bands of Indians from the United States under any treaties, agreements, or laws of Congress, or for the misappropriation of any of the funds of said tribes or bands, or for the failure of the United States to pay said tribes or bands any moneys or other property due; and confers jurisdiction on this court, with the right of either party to appeal to the Supreme Court of the United States, to hear and determine as right and justice may require and upon a full and fair arbitration all legal and equitable claims, if any, of said tribes or bands against the United States and to enter judgment thereon.
Section 2 provides that the United States shall be allowed as an offset against any amount that may be awarded the Indians all sums, including gratuities, paid or expended for the benefit of the Wichitas or any band thereof.
Plaintiffs’ claim in substance (1) that from time immemorial, and not later than about 1719, and with the assent and acknowledgement of all other Indian tribes and bands having any knowledge of them and of the country herein *413 claimed, they had as their habitat and range, and claimed, used, and occupied as their own for their fields, grazing, ranging, and hunting grounds, the region of country herein-above described, comprising 10,283,635 acres in what is now Oklahoma and Texas, including the territory well known as the “leased district” and “Greer County,” and that under the terms of Section 1 of the Jurisdictional Act this court is given full power to hear and determine this claim based on immemorial possession and occupancy, and to enter judgment thereon. (2) That the treaty of August 24, 1818 (7 Stat. 176), with the Quapaw Indians, who ceded to the United States the same territory herein claimed by plaintiffs and the compensation paid thereunder for the alleged cession of such territory, either in whole or in part, is not binding upon plaintiffs who were not parties thereto and does not preclude the plaintiffs from asserting and this court from entertaining jurisdiction and deciding that plaintiffs, in fact, were the Indians who at that time, and prior and subsequent thereto, possessed and occupied the territory in question. (3) That the possessory and occupancy title of plaintiffs has been recognized by the United States in treaties with it and that the rights of plaintiffs to assert their claims made herein were stipulated in Art. 6 of an agreement of June 4, 1891, with the United States, ratified March 2, 1895 (28 Stat. 876, 897). (4) That plaintiffs are entitled to an award against the United States of just compensation for lands and other property appropriated by Texas which they exclusively possessed and occupied, which exclusive possession and occupancy was recognized by other Indian tribes and by the United States and Texas.
We are of opinion from a consideration of the entire record and such information as can be obtained from the history of the plaintiff tribe and affiliated bands, including the Caddoes, and the information disclosed by the record with reference to other tribes and bands of Indians in the territory for which the petition here claims compensation as for a taking, that plaintiffs’ claims, which in substance are based upon aboriginal occupancy plus recognition of the rights of the Indians by treaties between them and the *414 United States and agreement of tbe United States therein to protect plaintiffs in their rights of occupancy, cannot be sustained. A claim based solely upon aboriginal occupancy is, we think, not within the terms of Section 1 of the Jurisdictional Act. But, even if it should be held that the Jurisdictional Act confers authority to consider such claim, we are nevertheless of the opinion, from the record, that such a claim is not sustained by the record.
No useful purpose would be served by a detailed discussion and an attempt to reconcile the, different theories of the origin of the Wichitas and affiliated bands. Their early history and wanderings, including the extent to which they lived upon, roamed, and hunted over the territory in question as shown by the record, have been succinctly set forth in the findings. These Indians appear to have roamed and hunted for many decades without any fixed habitation for any very considerable period of time over a vast extent of territory in and over which many Indian tribes and bands roamed and hunted, until the Wichitas became permanently settled on the Wichita Reservation of 143,251.19 acres in the State of Oklahoma and within the area for which compensation is otherwise claimed in this suit. The Wichitas and affiliated bands appear to have been a peaceful tribe of Indians and they have never been known to have engaged in war with the United States or with white settlers who met with them from time to time. Their maximum population of approximately 4,000 appears to have existed about 1719 when, as the record indicates, they were located somewhere near the Arkansas River at the mouth of the Canadian River. From that time until about 1835 when a treaty of peace was negotiated by the United States and entered into August 24,1835 (7 Stat. 474), with the Wich-itas, and other tribes and bands of Indians, the Wichita tribe and affiliated bands appear to have removed or to have been driven by wars with the Osage Indians westward to a point near the 100th meridian and south of the Red River. The population of the Wichita and affiliated bands was materially reduced from time to time during this period by wars and disease until they were found on the south and north banks of the Red River, at which time the population of the *415 Wichita tribe and its affiliated bands appears to have been between five hundred and a thousand. During this time, however, the Wichita and affiliated bands did not occupy the territory herein claimed, or any very considerable portion thereof alone as, prior to 1888, some twenty-seven other tribes resided, roamed, and hunted over the territory between the Red Diver and the Canadian, as was pointed out and found as a fact by this court upon the claim made by the Wichitas in the case of The Choctaw and Chickasaw Nations v. The United States and the Wichita and 'Affiliated Bands of Indians (34 C. Cls. 17,73). When the Wichita and affiliated bands reached the Red River in the western limits of the territory for which they herein claim compensation, the affiliated bands appear to have gone farther into the territory which is now Texas and lived there until they were removed from Texas to the north bank of the Red River in the “leased district” in 1859. The facts also show that the Wichitas also, for a time, resided and had their villages on the south bank of the Red River. After the treaty of peace of 1835, the Wichitas appear to have migrated back into the territory between the 98th and' 100th meridian eastward to a point near Ft. Sill, somewhat west of the 98th meridian. Other tribes or bands of Indians also continued to occupy, roam, and hunt over that territory.
The evidence shows that wherever the Wichitas settled from time to túne they established villages and constructed thatched houses or huts and the women members of the tribe engaged in agricultural pursuits to some extent and that the Wichitas traded in these agricultural products with other tribes and bands of Indians; that the male members of the tribe guarded the tribe against other Indians and went on buffalo hunts occasionally but not for very great distances as buffalo was plentiful in this territory. There is no evi-" dence in this record to show, beyond mere conjecture, the extent of any territory within the large area now claimed by plaintiffs which they claimed, possessed, and occupied to the exclusion of and with the recognition of other tribes and bands of Indians who lived, roamed, and hunted within the area in controversy. The assertion of plaintiffs that they claimed as their own and exclusively possessed and occupied *416 this vast area or territory with the recognition and consent of other tribes and bands of Indians prior to and subsequent to the Quapaw treaty of 1818 and the Choctaw treaties of 1820, 1830, 1855, and 1866, is a conclusion for which we can find no substantial support in the record and can only be based upon conjecture. The available facts and history with reference to the territory here involved and of the plaintiffs and other tribes of Indians require the conclusion that plaintiffs did not exclusively possess and occupy this territory.
We do not deem it necessary to discuss at length the Qua-paw treaty of 1818 other than to point out that this treaty purported to and did cede to the United States all the territory herein claimed by plaintiffs, and the United .States has ever since that date acted upon that cession and asserted title thereunder to the lands in controversy as public lands to which all Indian title of occupancy had been extinguished. It seems clear, therefore, that unless some other treaty, agreement, or act of Congress subsequent to the Quapaw treaty has recognized or conceded possessory and occupancy title to the territory involved as being in the Wichita and afiiliated bands, the Jurisdictional Act is not sufficiently broad in its terms to confer jurisdiction upon this court to award compensation to plaintiffs for this vast territory upon the basis of immemorial possession. Without express authority from Congress, or authority otherwise clearly indicated, the courts are bound to recognize treaties as lawfully made and as the supreme law of the land. Sisseton & Wahpeton Bands of Sioux Indians v. United States (58 C. Cls. 302); Duwamish Tribe of Indians, et al. v. United States (79 C. Cls. 530, 579); The Crow Nation or Tribe of Indians of Montana v. United States (81 C. Cls. 238); Eastern or Emigrant Cherokees and Western or Old Settler Cherokees v. United States (88 C. Cls. 452, 467). But, assuming that one of the purposes of the Jurisdictional Act was to authorize this court to allow a claim based on immemorial possession if supported by sufficient evidence, we are of opinion that the claim based on immemorial possession and occupancy is not sustained by the evidence and cannot be allowed. The G hoot aw and Ghiehasaw Nations v. United States, *417 supra; The Assiniboine Indian Tribe v. United States (77 C. Cls. 347); Coos (or Kowes) Bay, Lower Umpqua (or Kalawatset) and Siuslaw Indian Tribes v. United States (87 C. Cls. 143). On this phase of the case, which was presented to, considered, and decided by this court in the “Leased District” cases (34 C. Cls. 17), supra, at page 73, this court said:
No treaty of limits has ever been made with the Wichitas. If they were the substantial people in the early days they now claim to have been, the omission to treat with them is remarkable. If the United States did not favor the peaceful and friendly tribe having-some permanent abode, it was not because there was any desire to establish friendly relations with wandering savages at the expense of those willing to aid the pioneer whites in civilizing the country.
During the times the French, Spanish, Mexican, and Texas governments had dominion over the tribe the Wichitas were not recognized as aboriginal possessors of the soil. Ignored for two centuries by the political departments of five governments, how can the judiciary now establish limits of territorial occupation for them without something more specific than what we have to tell where their limits began and where they ended in that vast region known as the Great Prairie west of the Cross Timbers?
We find as a fact that even if the Wichitas occupied any portion of the prairie they did not do so alone. Their claim, then, cannot be considered an exclusive claim. Prior to 1833 twenty-seven other tribes resided between the Red River and the Canadian. And some six years before the removal of the Wichitas to their present reservation the Northern Comanches and Kiowas were reported as numbering 18,950, while* the Southern Comanches were placed at 1,000 in number. (Report Actg. Supt. Howard, 1852.) Whatever their number in the eighteenth century, these last three bands roamed over the prairies and were certainly as much prairie Indians as any others. They were more numerous than the Wichitas, and, making greater use of the prairie, were more entitled to be called prairie Indians.
Which of these tribes was first on the prairie does not clearly appear, but as the entire region was used indiscriminately by the various bands, and all were there in common from time to time, one insignificant band cannot now be deemed to have held the only original occupation of the country.
*418 The failure of the Wichitas is greater still- to show and establish occupancy ahead of others to the reservation in suit, in the sense of Indian occupation, until a date comparatively recent. It is quite probable that from time to time they passed over it while roaming over other parts of the country north of Red River, but it is doubtful if their claim to the reservation would ever have been given life but for the act of the Government in quartering them upon it after the Choctaw lease of 1855. * * *
The Court would be lost in the realms of conjecture in attempting to reconcile the different theories of the origin of the Wichitas. One of their traditions places the main tribe on the Neosho River, in Kansas, about 1781, from whence two bands left the main tribe, one taking up a residence in Texas and the other locating near the present town of Wichita in Kansas. Modern reports class them as Wacoes and Towaconies, and virtually one people. The three tribes speak the same language, and those Wichitas prosecuting the present claim presumably came out of Texas. The Wacos and Towaconies lived there beyond the prairies and pretend to nothing in the way of an interest in the land except under recent agreement.
We deem it unnecessary to pursue the inquiries into this branch of the case further. The main issues have been presented. The labyrinth of detail, if fully stated, would but serve to encumber the record. Our conclusion concerning the matter of occupation is that the Wichitas have not established such an occupancy of the land in suit at the time of its acquirement by the United States as would support the customary Indian title, or possession of such character that the United States can now recognize or is under obligation to protect for purposes of compensation.
Upon appeal by all the parties in the “Leased District” cases, supra, the Supreme Court held that the jurisdictional act in that case would not allow a presentation of a claim by the Wichitas to the entire “leased district” and limited review to the claim of the Choctaws and Wichitas to the proceeds from sale of the surplus lands in the Wichita reservation of 743,257.19 acres. Thereupon this court entered judgment in favor of the Wichitas and affiliated bands for $675,371.91 which was paid.
*419 The evidence and information upon which, this court in the Leased District cases passed upon the question now presented is, for the most part, the evidence and information upon which', plaintiffs rely in this proceeding. Upon the evidence then before the court and upon such additional evidence and information as has been submitted by plaintiffs in this proceeding, we now affirm the holding of this court on this phase of the case for the reasons then stated by the court. Such additional evidence as has been submitted in this proceeding does not warrant a different conclusion.
In Assiniboine Indian Tribe v. United States, supra, the jurisdictional act, as amended, specifically conferred jurisdiction and authority to adjudicate and render judgment on j a use and occupancy title by immemorial possession. This, court held that a claim to title to lands based on immemorial possession could not be sustained where the evidence showed that other tribes similarly occupied and possessed such! territory. In Ooos Bay Tribe of Indians case, sufra, thei jurisdictional act also specifically authorized jurisdiction and entry of judgment upon the claim “arising under or growing out of the original Indian title, claim, or rights of the said tribe * * At pages 152-153, this court said:
* * * the United States never recognized the plaintiff Indians as the aboriginal owners of the lands they now claim. What the United States did with respect to their existing status was done under its plenary authority over tribal Indians, their lands and funds. The United States consummated no treaty relationship with them and until the agreement of October 31, 1892, supra, [28 Stat. 286, 323], recognized no existing rights of property to any specific area of lands to be vested in them. * * * To establish Indian title to a vast acreage of lands by oral testimony, irrespective of the obstacles of establishing it by any other method, exacts a degree of proof sufficient to overcome contemporaneous documentary and historical evidence to the contrary. No doubt exists that the plaintiff Indians originally did reside upon the Coast Reservation with the other tribes thereon; how long they continued this residence and what particular portion thereof was concededly theirs are impossible of ascertainment.
*420 With respect to plaintiff’s claim that their possessory and occupancy title was recognized in treaties with the United States, it appears that prior to 1872 the United States had entered into only two treaties with plaintiffs, the first being the treaty of August 24, 1835, supra, and the second, the treaty of May 15, 1846 (9 Stat. 844). The first treaty of 1835 was entered into for the purpose of establishing and perpetuating peace and friendship between the United States and the Comanche and Wichita nations, and their associated bands or tribes of Indians, and between these nations or tribes and the Cherokee, Muskogee, Choctaw, Osage, Seneca, and Quapaw nations or tribes of Indians, and there was no cession of any land involved therein. We think it is clear from the provisions and purposes of this 1835 treaty: that there was no recognition of title, possessory or otherwise, accorded by the United States to any Indian tribe party to the treaty. In Blachfeet et al., Tribes of Indians v. United States (81 C. Cls. 101), this court held that the rule for construction of treaties between Indians and the government most favorable to the Indians does not extend to the point of permitting the court to indulge in presumptions and implications of assumed obligations by the government where the attendant facts and circumstances clearly negative any intention on the part of the government to assume such obligations.
Plaintiffs contend, however, that under Art. 4 of this treaty, which provided that “It is understood by all the nations or tribes of Indians, parties to this treaty, that each and all of the nations or tribes have free permission to hunt and trap in the Great Prairie west of the Cross Timbers, to the western limits of the United States,” the United States recognized the lands in question as being in plaintiffs and allege that this treaty recognized the habitat of petitioners and their settlements and hunting grounds as in the petition set forth. When considered in its entirety we cannot so interpret the treaty. As was said by this court in respect of this treaty in its opinion in the “Leased District” cases, supra, at page 81, “But if the treaty of 1835 be considered an admission of Wichita occupation it must also be considered with that of 1837 as an admission of Osage, Quapaw, *421 Seneca, Comanche, Muskogee, and Cherokee occupation. Neither treaty appears to us as an admission of title in favor of any tribe.”
The second and final treaty consummated between the United States and plaintiffs was that concluded at Council Springs, Texas, on May 15, 1846, proclaimed March 8, 1847, supra, between the Comanche, Ioni, Anadaca, Cadoe, Lepan, Longwha, Keechy, Tahwacarro, Wichita, and Wacoe tribes of Indians and their associate bands. A consideration of the provisions of this treaty fails to reveal any provision that may be considered a recognition on the part of the United States of Indian title in any land as belonging to plaintiffs. This treaty appears to have been entered into for the purpose of having the Indians acknowledge themselves to be under the protection of the United States and under no other power, state, or sovereignty. For the reasons stated, we are of opinion that plaintiffs are not entitled to recover compensation for any of the lands in question under the terms of either of these treaties.
The record shows that with the exception of a portion of the Wichita tribe proper, its affiliated bands, the Towaconies, Wacos, Keechis, Ionies, and Delawares were at the time of the admission of Texas as a state in 1845, and for many years prior thereto, inhabitants of territories which at various times in the past had been under the dominion of France, Spain, and Mexico, and the republic of Texas. It is upon this residence of the affiliated bands that plaintiffs base their claim to the 5,200,000 acres of land in Texas. We think it is clear that this claim cannot be sustained. All public lands within the borders of Texas remained, upon its admission as a state, property of the State of Texas and the government of the United State's has never at any time had title to or claimed any public lands in that state. Texas had made certain treaties with the Indian tribes within its borders, but we need not discuss those treaties here. When the Indians were removed by the United States from Texas for their own protection and safety, the reservation in that state formerly occupied by them became the property of the State of Texas and the lands within those reservations were added by Texas to its public domain. The citizens of Texas *422 were responsible for the removal of the affiliated bands to Oklahoma, as shown by the annual report of the Commissioner of Indian Affairs, 1859. In these circumstances the United States cannot be held liable to compensate these Indians for the loss of their lands in the State of Texas, in and to which the United States had no right, title, or interest before or after the Indians were compelled to abandon them.
With respect to the claim for $40,000 as the value of other property, such as houses and stock lost by the Indians upon their removal from Texas, we are of opinion from the facts disclosed by the record that plaintiffs caimot recover on this claim. The record shows that the United States and its agents did everything they reasonably could to remove from Texas, with the Indians, all of their movable property, and that this was accomplished with the exception of about five hundred head of horses and cattle. The facts do not show the value of this stock but they do establish that every effort which could be reasonably expected of the United States was made to corral and remove the stock but that this could not be done without the loss of life. The record shows that the Supervising Indian Agent of Texas Indians, Robert S. Neighbors, lost his life by reason of his efforts to protect the Texas Indians and to save their property. With respect to the value of the houses in Texas, which is included in this item of the claim, the facts show that these Indians upon their removal from Texas into the “Leased District” north of the Red River were furnished houses by the United States equally as good if not better, and of a greater value, than those which they were compelled to abandon in Texas.
The claim for recovery of the amount alleged to have been expended by plaintiffs and the intervenors in prosecuting their rights in, the former litigation between the Choctaw and Chickasaw nations and the United States appears to have been abandoned. In any event, it seems clear that no recovery can be had on this item of the claim for the reason that such an amount as was expended was for the payment of compensation to attorneys employed by the Indians and for typing and printing costs for which the United States cannot be held liable.
*423 Plaintiffs make objection to certain of the expenditures by the defendant claimed as offsets on the ground that they were not expenditures properly chargeable against the tribes or bands, as such, but in view of our conclusions that plaintiffs and the intervenors are not entitled to recover on any of the main issues in the case, it is unnecessary to discuss these objections to the nontreaty and gratuity expenditures set up by the defendant as an offset or credit.
The petitions are dismissed. It is so ordered.
Whitaker, Judge; Williams, Judge; Green, Judge; and Whaley, Chief Justice, concur.