The **UNITED STATES**

v.

The **DELAWARE TRIBE OF INDIANS**
and the Absentee Delaware Tribe
of Indians.

No. 6–69.

United States Court of Claims.

June 12, 1970.

Ralph A. Barney and W. Braxton Miller, Washington, D. C., with whom was Asst. Atty. Gen. Shiro Kashiwa, for appellant.

Louis L. Rochmes, Washington, D. C., attorney of record, for appellees. Pritzker, Pritzker & Clinton, Chicago, Ill., of counsel.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON, and NICHOLS, Judges.

ON APPEAL FROM THE INDIAN CLAIMS COMMISSION

SKELTON, Judge.

This is an appeal by the government and a cross-appeal by the plaintiffs, Delaware Tribe of Indians and Absentee Delaware Tribe of Oklahoma, hereafter called Delawares or plaintiffs, from a decision of the Indian Claims Commission of June 4, 1969, reported in 21 Ind. Cl.Comm. 18. The Claims of the parties originated in a suit by the Delawares to recover the value of a strip of land in Kansas known as the Delaware "outlet" which was 10 miles wide and 150 miles long from east to west, beginning about 45 miles west of Leavenworth. This "outlet" was granted to the Delawares, along with an area known as the "Homelands" (not involved here) by the United States by treaty dated October 3, 1818, 7 Stat. 188. In the treaty of May 6, 1854, 10 Stat. 1048, the Delawares ceded both areas to the United States. The treaty provided that the Delawares were to be paid $10,000.

When the question of increased payment to the Delawares for the outlet was first considered by the Indian Claims Commission, it held that the Delawares had failed to prove they had title to the outlet lands. (2 Ind.Cl.Comm. 253, 536 (1952)). This court reversed that decision, holding that they did have title. Delaware Tribe of Indians v. United States, 128 F.Supp. 391, 130 Ct.Cl. 782 (1955). In a subsequent proceeding before the Indian Claims Commission, it likewise held that the Delawares had title to the outlet. (Delaware Tribe v. United States, 3 Ind.Cl.Comm. 622 (1955)). The Commission also held that the Delawares had ceded the 960,000 acres in the outlet that was worth $617,980 for a consideration of $10,000, and that they were entitled to the difference. (Id. at 8 Ind.Cl.Comm. 150 (1959)). This left only the question of what offsets, if any, should be deducted from the gross judgment of $607,980 and the question of whether or not the outlet lands

contained more than 960,000 acres as contended by the Delawares.

These questions were tried, argued, and re-argued before the Commission in the period from 1961 to 1968, and the opinion of the Commission was handed down on June 4, 1969 (21 Ind.Cl.Comm. 18). Each party has raised two separate issues on appeal from this decision. The government's contentions are that the Commission erred in:

1. Adopting an arbitrary rule governing the allowance of gratuitous offsets contrary to the intent of Congress as expressed in the Indian Claims Commission Act and contrary to its previous decisions and those of this court; and

2. Determining that the United States was not entitled to any credit by way of offset for the interest in land which it claims was gratuitously given to the Delawares in the Wichita Reservation.

The Delawares contend in their cross-appeal that the Commission erred in:

1. Holding that the outlet was 10 miles wide by 150 miles long and contained only 960,000 acres as established by surveyor McCoy; and

2. Deciding that the government was entitled to full credit as a payment on the claim for the sum of $150,000 paid in settlement of twelve lawsuits filed by the Delawares, one of which included the outlet claim.

We will consider these issues in the order they are listed above.

I

*The Commission's Five Percent Rule For Allowing or Denying General Gratuities of the Government as Offsets*

The government contends that it is entitled to be credited with general gratuities in the total sum of $72,600.37 as offsets on the $607,980 due the Delawares for the outlet lands, which gratuities were made by it for the benefit of the whole tribe from 1860 to 1942. These gratuities were made for food, clothing, shelter, cattle, seeds, and other subsistent expenses and ranged from a few cents in some years to a maximum of $4,434.09 in one year (1869). They are itemized by years in finding 60 of the Additional Findings of Fact of the Commission.

These general gratuity offsets were denied by the Commission, and in doing so it announced a new rule governing the allowance or denial of such offsets which it applied in this case and which it said it would apply in all pending and future cases involving this problem. This rule is as follows:

In a case as here, where the award is based on what the Indians should have received for their land, the Commission will look to the additional consideration that should have been paid, and assume that 5% per annum of that sum as income should have been available to the Indians for their own purchase of such living expenses as rations, clothing, shelter, cattle, seeds, etc. "In good conscience" the Government should only receive credit for proved tribal gratuities above what the Indians could have provided for themselves had they received an adequate consideration in the original transaction. For any year, only those general gratuities amounting to more than 5% of a principal award for additional consideration for land will be considered eligible for offset. This rule is expected to be applicable to the bulk of the cases before the Commission, although proof of special circumstances on the whole course of dealings might require different action as before.

The defendant says that this rule as applied to this case would mean that since the Commission had previously determined that the Delawares should have been paid an additional sum of $607,980 for their outlet lands, the Commission would not consider any general gratuities as eligible for offsets which did not exceed, in any one year, five percent of this amount or $30,400. Of course, there were no general gratuities in any one year involved here that amounted to that much, as the greatest amount paid in one

year (1869) was $4,434.09. The defendant further says that the effect of this rule is to deny the government credit for eligible general gratuities contrary to the will of Congress as expressed in the Indian Claims Commission Act. We think the defendant is right. The Act provides with respect to gratuities as follows:

> * * * [T]he Commission may also inquire into and consider all money or property given to or funds expended gratuitously for the benefit of the claimant and if it finds that the nature of the claim and the entire course of dealings and accounts between the United States and the claimant in good conscience warrants such action, may set off all or part of such expenditures against any award made to the claimant, * * *. [25 U.S.C. § 70a (1964).]

█ In our opinion, the Act clearly authorizes the Commission to allow eligible gratuities as offsets against any award. A literal reading of the above portion of the Act compels this conclusion. Furthermore, we so held in the case of Red Lake, Pembina & White Earth Bands v. United States, 164 Ct.Cl. 389 (1964), when we said:

> b. Appellants next contend that under the circumstances of this case, no deduction of gifts from the award is allowed by the Indian Claims Commission Act. * * * [U]nder the Act, "gratuities" can be deducted from awards. Congress so enacted the law, and we can hardly say that in creating and vesting in the Indians a right to relief, Congress could not impose conditions and limits on the award of that relief. Cf. Duwamish et al. Indians v. United States, 79 Ct.Cl. 530, 611 (1934) cert. denied, 295 U.S. 755, 55 S.Ct. 913, 79 L.Ed. 1698, dealing with an earlier jurisdictional act. [Id. at 396.]

█ The application of the new five percent rule of the Commission to the gratuities in this case would mean that no matter how eligible the gratuities might be for offset under the Act in any given year, they would not be allowed because in each of the years involved in this case they were less than five percent ($30,400). The result of such an application would be that even if gratuities in a given year met all necessary requirements of an offset, they would not be allowed. We do not believe Congress ever intended such a result. Furthermore, such a policy appears to be directly in conflict with the Act itself.

The Delawares say that the five percent figure is a ceiling which may never have to be applied, because from the reported cases it appears unlikely that the government ever expended as general gratuities such a high percentage of the values of lands which have been the subject of claims. They say that the ratio in the instant case is one-tenth of one percent and that this would probably be typical of the cases. This argument, if true, is not helpful to the Delawares. In fact, it proves defendant's argument that if the five percent rule is applied it would mean that no general gratuity, no matter how eligible, would ever be allowed as an offset because it would be less than the specified five percent. This would be contrary to the Act and to the will of Congress.

In any event, the five percent rule conflicts with the custom and practice and decided cases of the Commission and of this court during the past twenty years. The Commission itself admits this to be true by the following statement in its opinion:

> * * * In the past, the Commission has exercised the Congressional grant of discretion by weighing all the circumstances of the nature of the claim and the course of dealings in passing on the claimed offset. * * * [Id. at 23.]

█ In Peoria Tribe v. United States, 9 Ind.Cl.Comm. 274 (1961), the Commission pointed out what it was

required to do in considering gratuities as offsets when it said:

> * * * All in all the defendant claimed between 1818 and 1907 total gratuitous expenditures in the amount of $3,055.54. Of this sum the petitioners seriously challenged only the one item of $417.83 which was disbursed in 1854 and 1855 by the defendant to cover expenses of the Wea Indian delegation. Although the petitioners have decided not to challenge any of the other categories, principally because of the relatively small amounts involved, *the Commission is still obligated to pass on the validity of each and all of such gratuitous claims as presented by the defendant.* [Emphasis supplied.] [*Id.* at 293.]

*See also* Quapaw Tribe of Indians v. United States, 1 Ind.Cl.Comm. 644 (1951), aff'd, 120 F.Supp. 283, 128 Ct.Cl. 45 (1954); and Kiowa, Comanche & Apache Tribes v. United States, 5 Ind. Cl.Comm. 72, 5 Ind.Cl.Comm. 297 (1957), aff'd, 163 F.Supp. 603, 143 Ct.Cl. 534 (1958), cert. denied, 359 U.S. 934, 79 S.Ct. 650, 3 L.Ed.2d 636 (1959) for other decisions of the Commission showing their consideration of gratuities as offsets on an item by item and case by case basis. This court has followed the same practice. *See* Quapaw Tribe of Indians v. United States, *supra,* and Kiowa, Comanche & Apache Tribes v. United States, *supra.* We feel that the Commission and this court are bound by such prior decisions under the doctrine of *stare decisis* inasmuch as they have not been overruled.

The government makes the further argument that the five percent rule is invalid because it allows the Delawares to collect interest from the government. It is well established that the United States is not liable for interest in the absence of a contractual or statutory requirement to pay interest. *See* Pawnee Indian Tribe of Oklahoma v. United States, 301 F.2d 667, 157 Ct.Cl. 134 (1962), cert. denied, 370 U.S. 918, 82 S.Ct. 1556, 8 L.Ed.2d 498; United

States v. Alcea Band of Tillamooks, 341 U.S. 48, 71 S.Ct. 552, 95 L.Ed. 738 (1951). In line with this rule are the decisions that awards based on unconscionable consideration do not draw interest under the Indian Claims Commission Act. Osage Nation of Indians v. United States, 97 F.Supp. 381, 119 Ct.Cl. 592 (1951), cert. denied, 342 U.S. 896, 72 S.Ct. 230, 96 L.Ed. 672; and Kiowa, Comanche & Apache Tribes v. United States, *supra,* 163 F.Supp. at 609–610, 143 Ct.Cl. at 543–544; Confederated Salish & Kootenai Tribes, etc. v. United States, 175 Ct.Cl. 451 (1966), cert. denied, 385 U.S. 921, 87 S.Ct. 228, 17 L.Ed.2d 145; Peoria Tribe, etc. v. United States, 390 U.S. 468, 88 S.Ct. 1137, 20 L.Ed.2d 39 (1968). The Delawares and the Commission do not disagree with these principles, but contend that the five percent rule does not allow the collection of interest from the government. The Commission took particular pains to make this clear when it said in its opinion in this case:

> * * * In no sense does it amount to an award of interest on the claim, although for convenience an interest measurement furnishes a guideline for distinguishing those gratuities not bearing sufficient equity to warrant offset. * * * [*Id.* at 28.]

However, the manner in which the rule is to be applied to determine the allowability of offsets as expressed in the Commission's opinion raises serious questions as to whether or not the exclusive use of the formula of the rule amounts to the granting of interest on the award. In this connection, the Commission said:

> * * * [T]he Commission will look to the additional consideration that should have been paid, and assume that 5% per annum of that sum as income should have been available to the Indians for their own purchase of such living expenses as rations, clothing, shelter, cattle, seeds, etc. * * * For any year, only those general gratuities amounting to more than 5% of a principal award for additional con-

sideration for land will be considered eligible for offset. * * * [*Id.* at 28.]

A somewhat similar situation existed in Kickapoo Tribe of Kansas v. United States, 15 Ind.Cl.Comm. 628 (1965), aff'd, 372 F.2d 980, 178 Ct.Cl. 527 (1967). There the Indians were objecting to the granting of similar offsets on the grounds that the award was worth much less at the time it was made than it would have been worth in 1854 when they should have received it as the fair market value of their lands, and the gratuities represented only a small fraction of what a reasonable rate of interest would be. The Commission rejected this argument on the ground that to deny the offsets for these reasons would in effect be granting interest on the award. The Commission said:

> We do not believe this is the proper interpretation or application of the "entire course of dealings and accounts" clause of the Indian Claims Commission Act. To disallow the offsets in this case for the above reasons would nullify, for all practical purposes, the offset provisions in the Indian Claims Commission Act. *In effect it would be granting interest on the award under another guise.* We do not believe this was the intention of Congress in inserting this clause in the Act. [Emphasis supplied.] [*Id.* at 664–65.][1]

■ We find the term "interest" is defined in Webster's Third International Dictionary (1966) in various ways. One significant definition is "an excess over and above an exact equivalent." Again, in Webster's Seventh New Collegiate Dictionary (1965), we find it defined as "an excess above what is due." If we can assume for the purpose of illustration that all of the gratuities in this case in the total sum of $72,600.37 were proper ones and were eligible in every way to be allowed as offsets, their denial by the Commission solely because

of its five percent rule had the effect of taking that much away from the government and confirming ownership thereof in the Delawares as an amount above and in excess of what they were entitled to receive for their outlet lands. In other words, the $72,600.37 vested in the Delawares by its denial as offsets because of, and only because of, the five percent rule, was not a part of the consideration awarded them for their lands, but was in addition to it. It meets the requirements of the definitions of "interest." We conclude that even if it could be said that the $72,600.37 was not interest per se or interest in the strict sense of the word, the act of the Commission in denying this amount as offsets solely by reason of its five percent rule had the effect of granting interest on the award. We do not believe the Commission can do indirectly what it is prohibited from doing directly.

The Commission cites the recent decision of the Supreme Court in Peoria Tribe v. United States, *supra*, as authority for its five percent rule. We think its reliance on that case for this purpose is misplaced. There, by treaty, the United States obligated itself to sell the lands for the Indians and to invest the proceeds and pay interest annually to the tribe or spend it for their benefit. The government breached the treaty by failing to sell the land and invest the money and pay interest to the Indians. The Supreme Court allowed the Indians an amount over and above the amount of their award, not as interest, but as damages. The Commission, in commenting on that case, said:

> * * * The reasoning [of the Court] may be broadly stated to be that had the Indians received the full compensation they should have received, that sum would have been invested (by treaty), so they should also receive the equivalent of interest on sums they should have received, but actually did not. The Commission has studied

1. *See also* Pawnee Indian Tribe of Oklahoma v. United States, 301 F.2d 667, 157 Ct.Cl. 134 (1962), cert. denied, 370 U.S. 918, 82 S.Ct. 1556, 8 L.Ed.2d 498.

carefully the holding of the Court and has issued its order setting the appropriate measure of damages, see Peoria Tribe v. United States, 20 Ind.Cl. Comm. 62 (1968). The Commission in its future holdings will give great weight to the principle of the Supreme Court's decision: To make the Indians whole by considering what the full benefits would have been had the Government done what it should have done at the time of the transaction complained of.

In this case, as in many others before the Commission, the principal award is based on what the Indians should have received in compensation when relinquishing their land. Had they received that full compensation, it presumably would or could have been placed in an interest-bearing fund, and provided an additional annual income for the tribe. With that additional annual income, the tribe would have been able to provide a greater portion of its needs, and the Government obliged to furnish less. There is a causal relation between the original Government failure of full payment, and the subsequent need for the various types of gifts now commonly claimed as general gratuities by the Government. It is our opinion that to the extent the Indians would have been able to provide their own needs had the Government fulfilled its obligation, the test of "in good conscience" under our statute does not allow the offset of subsistence-related expenditures the need for which was created by the Government's failure to pay full value.

Following the reasoning of our recent *Peoria* decision, *supra,* we find a statutory guideline for determining what amount Indian land sale proceeds should have produced: 25 U.S.C.A. 158. This general statute, in effect from 1836 to present, calls for 5% interest to be paid on Indian land sale proceeds required by treaty to be invested for the Indians. For the present purpose, the Commission will consider this figure as the reasonable guideline to what sums the Indians should have had available to them had the Government not failed in its obligation to them. [*Id.* at 26–27.]

In our case, there was no treaty or agreement requiring the government to sell the land of the Delawares and to pay them interest, as was the case in *Peoria, supra.* Thus, the cases are quite different. The reasoning of the Court in allowing interest as damages in that case does not apply here. This is a case of unconscionable consideration paid to the Indians for their lands and not a case of breach of treaty or agreement. Interest is not allowable against the government on an award in this kind of a case. If the reasoning of the Commission quoted above "to make the Indians whole by considering what the full benefits would have been had the government done what it should have done at the time of the transaction complained of" is followed literally, it would authorize the collection of interest from the government on awards in all cases involving unconscionable consideration even where no gratuity-offset problem is involved. We believe this would be contrary to law.

The Commission presumed that if the $607,980 had been paid to the plaintiffs in the beginning (1854), it would have been invested at interest and provided sufficient funds for their subsistence during all the 88 years the government furnished them the gratuities (1860–1942), thus making such gratuities unnecessary. It does not appear that the record supports this presumption. It is more likely that the funds would not have earned interest because in the absence of a treaty or agreement requiring it, no Indian funds in the Treasury drew interest until the passage of 45 Stat. 1164, 25 U.S.C. § 161a (1964), in 1929, requiring the payment of interest. Furthermore, it is more logical to assume that the Indians would not have kept their funds invested for almost a hundred years but would have required that they be distributed to them per capita after a short period of time. The defendant points out that this is what hap-

pened under the Treaty of May 6, 1854 (10 Stat. 1048) where the permanent annuities of the tribe were funded in the amount of $148,000 and were to be paid out in two years.

 The Commission has adequate authority under the "equity" and "good conscience" powers granted to it under the Indian Claims Commission Act to allow or deny the general gratuities as offsets in this case or in any other case, without using its newly promulgated five percent rule. Such authority and powers must be exercised on an item-by-item and a case-by-case basis. We know that this is burdensome and time-consuming. This is quite apparent when you consider that the gratuities in each of 28 of the years involved in this case were under $500, those in 19 were less than $100, and during 11 of the years they were less than $10. In 1913 the gratuity was seven cents and in 1911 it was exactly five cents![2] Imagine the frustration the Commission must feel in having a full scale hearing to determine whether a seven cent (bag of peanuts) gratuity or a five cent (bar of soap) gratuity (or whatever else the minuscule gratuities may have been) should be allowed as an offset on an award in the sum of $607,-680. Because of these absurd situations, multiplied many times no doubt in many cases, it is easy to understand that the Commission initiated this rule to expedite its work and to ease the burden of its heavy case load. We appreciate these worthy objectives. However, for all of the reasons set forth in the foregoing paragraphs, we have concuded that we have no alternative except to disapprove the rule and remand this portion of the case to the Commission for a consideration of the gratuities (including the five cent and seven cent items) on an item-by-item basis under its equity and good conscience powers under the Act to determine whether or not each of them shall be allowed or denied as an offset to the award. This is in accord with our deci-

sion in Kickapoo Tribe of Kansas v. United States, 372 F.2d 980, 178 Ct.Cl. 527 (1967).

## II

*Was The Wichita Reservation on which the Delawares were Placed a Gratuity for which The Government was Entitled to an Offset?*

 The Commission referred to and quoted from Wichita Indians v. United States, 89 Ct.Cl. 378 (1939) for a description of the early history of the plaintiffs. That case relates that since 1750 the Wichitas and members of their affiliated bands, including the Towaconies, Wacos, Keechis, Ionies, and the Delawares, lived, grazed livestock, farmed, hunted, and trapped from time to time on the south bank of Red River in what is now Texas and on the north bank of said river to the Canadian River in what is now Oklahoma. This area extended from the ninety-eighth meridian on the east to the 100th meridian on the west and encompassed some 10,283,635 acres. The Wichita Reservation we are now considering was located within this area. This court said in the above case that the Wichitas (which included the plaintiff Delawares) did not possess or occupy at any time "any very large portion" of such territory to the exclusion of other tribes or bands of Indians (thereby indicating that they did exclusively occupy and possess *some* of it). However, the court went on to say:

> * * * The record in this case does not establish as a fact that the Wichitas and affiliated bands of Indians at any time prior to 1859 ever possessed or occupied, to the exclusion of other tribes or bands of Indians, an area, within the territory which they claim, greater than the reservation within that territory of 743,257.19 acres which was set aside for and given to them by the United States for their absolute use and occupancy. [89 Ct.Cl. at 385.]

---

2. The small amounts in some of the years was due, no doubt, to allocations to plaintiffs of their proportionate share of gratuities made to the plaintiffs and to other tribes at the same time.

▇ The Commission relied on the above statement in our case, and we think rightly so, as a finding by our court, by inference at least, that the evidence would not negate Wichita (Delaware) exclusive use and occupancy within the area of the reservation.[3] The Commission pointed out that for the purpose of determining whether the value of the reservation should be allowed as an offset, it was not required to make a finding of aboriginal title for the Indians. It held, in effect, that the allowability of this claimed offset could be determined on the basis of the Indians' right to exclusive use and possession at the time of the 1872 agreement, described below, even though such use and possession may not have been sufficient for aboriginal title. We agree. The Commission said in this regard:

* * * For the purpose of determining this claimed offset, the Commission is not required to make a finding of aboriginal title for the Wichita, but we shall presume they had at least some area of exclusive use around their villages and the Court of Claims has located that area nowhere else but within the reservation. Their interest in the reservation, whenever perfected, would come under claim of right, not gratuitously. The defendant confirmed their possession of that reservation area by various acts over a long period, and denied them any claim of a right of possession elsewhere. [Id. at 21–22.]

To complete the picture, it should be pointed out that the plaintiffs became associated with the Wichitas with whom they were affiliated sometime prior to 1859 when all of them were invested with possession of the reservation. The Commission found that some of the Delawares had lived in the area for some years, perhaps a "long time." It further found that the Delaware rights to their interest in the reservation are equivalent to those of the Wichita. In 1855 the government leased a large tract of land from the Choctaw and Chickasaw Indians in the present State of Oklahoma (11 Stat. 611, 613) for the purpose of settling thereon the Wichita and other tribes. (This land was ceded to the government in 1866. 14 Stat. 769.) In 1859 a representative of the Commissioner of Indian Affairs set aside a portion of this land for the Delawares and Caddos. In 1872 an agreement was made between the Commissioner and the Wichitas and affiliated bands which provided for a reservation to be set aside for them in consideration whereof:

[T]he said Wichitas and other affiliated bands hereby cede and relinquish to the United States all right, title, interest or claim of any nature whatsoever in and to any lands in Texas, Louisiana, Indian Territory, or elsewhere within the limits of the United States. [*Id.* at 33.]

The reservation was described in the agreement as shown in the Commission's opinion. It is the reservation claimed as an offset in this case and comprises 743,-257.19 acres. The Wichitas and their affiliated bands agreed to go upon the reservation and no longer hunt, trap, or range on the remainder of the ten million plus acres formerly used by them for these purposes and agreed to be concentrated on the reservation. Congress did not immediately act on the agreement. However, the Wichitas and their affiliated bands have occupied the reservation since the date of the agreement. During the period 1873–1891 the appropriation acts of Congress regularly referred to the Wichita and others as Indians "who have been collected upon reservations set apart for their use and occupancy." Finally, in 1891, an agreement was entered into between the Wichitas and the government, which was incorporated in an 1895 statute (28 Stat. 895) allotting and ceding the reservation to the Indians. The defendant claims this was a gratuity and should be allow-

---

3. In the *Wichita* case (89 Ct.Cl. 378 (1939)), the Indians were claiming title to lands in the larger area outside of the reservation. The reservation itself was not involved.

ed as an offset in the case before us. The Commission found:

59. When the Wichitas and their affiliated bands consented to being concentrated on a reservation a fraction the size of the lands over which they had ranged, *they did not accept the reservation as a gratuity and in fact it was no gift*. There was consideration flowing from the Wichitas and their affiliates to the United States consisting of relinquishment of their traditional unfettered way of life. There was a relinquishment of an assertion of a right to roam over their entire former area. It was an object of United States policy to settle the tribes, and reduce the former hostilities from encounters between tribes. Thus the Wichita and Absentee Delaware interest in the reservation was not acquired as a gratuity and cannot be the basis of an offset. [Emphasis supplied.] [*Id.* at 34–35.]

The Commission denied the offset, saying:

The Commission must conclude that regardless of whether a treaty was the causative factor in compelling the Wichitas' exchange of freedom for a reservation, *that reservation was no gratuity*. Since the Plaintiffs were an integral component of "The Wichita and Affiliated Tribes" by the time that reservation was populated, it follows that *the Plaintiffs along with the others paid the consideration of living in circumscribed surroundings*. Viewed from any angle, the Government should not now benefit, by way of offset, for the fact that it only belatedly sought to give good title to these Indians to a reservation *within the area of their aboriginal lands*. The facts compel the conclusion that no share of the Wichita Reservation is a gratuity offsettable against the judgment in the case at bar. [Emphasis supplied.] [*Id.* at 22–23.]

We agree with the findings and decision of the Commission in denying this offset. We think the decision in this re-gard is supported by substantial evidence.

## III

*The Commission Held that the Outlet was 10 Miles Wide by 150 Miles Long and Contained 960,000 Acres of Land*

■ In their cross-appeal, the Delawares contend that the outlet contained about 2,000,000 acres instead of 960,000 as found by the Commission and that it was more than 150 miles long. They seek remand of the case to the Commission of this portion of the case for a correct determination of this acreage. The facts giving rise to this claim are generally as follows.

In 1829, by treaty between the government and the Delawares (7 Stat. 327), an area was conveyed to the Delawares at the forks of the Kansas and Missouri Rivers as a place of permanent residence for their nation, leaving an outlet 10 miles wide to the west. In this connection, the treaty provided:

* * * [I]t is hereby agreed upon by the parties that the country in the fork of the Kansas and Missouri Rivers, extending up the Kansas River, to the Kansas line, and up the Missouri River to Camp Leavenworth, and thence by a line drawn Westwardly, *leaving a space ten miles wide, north of the Kansas boundary line, for an outlet;* shall be conveyed and forever secured by the United States, to the said Delaware Nation, as their permanent residence * * *. [Emphasis supplied.]

The plaintiffs say that the "Kansas boundary line" referred to the north line of the Kansas Indian Reservation established by the Treaty of 1825 (7 Stat. 244), which reservation was 341 miles long (east to west). *See* McCauley v. United States, 1 Ind.Cl.Comm. 608, 613 (1951).

The Senate ratified the 1829 Treaty on May 29, 1930, by a resolution that provided that the President would ap-

point a surveyor to fix the boundaries of the area and of the outlet in the presence of a representative of the Delawares, and after the survey had been made and approved by the agent of the plaintiffs, the President would approve it. One Isaac McCoy was appointed to make the survey in accordance with the treaty and the resolution, and he did so in the presence of the Delaware agent John Quick. The surveyor located the outlet by surveying a line due west, leaving a space 10 miles wide north of the Kansas boundary line. This surveyed line was marked with monuments every five miles for 150 miles, and the 150 mile mark indicated it was the "End of Survey." This line so surveyed and marked became the north line of the Delaware outlet. McCoy made his report and submitted a plat of the outlet. This plat showed the Kansas north boundary line and the surveyed north line of the outlet with the monuments indicated every five miles and showing the "150 end of survey" marker just west of Solomons Fork of the Kansas River. However, the surveyed line (as drawn on the map but not surveyed) extended on westward beyond the 150 mile monument to a point even with the westward extension of the Kansas north line. The west end of the outlet is not closed on the plat, but is left open. The surveyor's report stated that when he had gone 150 miles:

We stopped about forty miles with the region abounding with Buffaloes, Elks and Antelopes * * *.

This fact was found to be significant by the Commission, because it showed that the purpose for which the outlet had been created had been fulfilled, namely, a strip or outlet over which the Delawares could travel westward from their residence lands to their hunting grounds. This also explained why the outlet was not shown to be closed to the west on the surveyor's plat. In other words, the outlet was supposed to "open out into the hunting country," and this was accomplished.

The Delaware agent, John Quick, approved the survey and thereafter it was approved by the President. One copy was filed in the government archives and one copy was forwarded to the Delaware Nation. The Senate Resolution of May 29, 1830, provided that when this was done it "shall be thereafter binding and conclusive upon the parties to the foregoing Treaty." The boundaries of the outlet do not appear to have ever been questioned until this suit was filed in 1948.

The plaintiffs contend that the outlet should have extended westward as far as the Kansas north boundary extended (341 miles). Also, they say the facts that there was nothing to require the surveyor to stop after he had gone 150 miles, and that his plat showed the surveyed line to extend on westward past the 150 mile marker, plus the further fact that the west end of the outlet on the plat was not closed, indicated that the outlet was more than 150 miles long and contained more than 960,000 acres. The Commission discussed the evidence in great detail and made findings on the evidence against the plaintiffs. We will not go further into the evidence on this question. The Commission made the following findings:

29. When the 1829 treaty and the official survey in connection therewith were approved by the President of the United States and when the 1854 treaty was negotiated and became effective, it was the understanding of the Delaware Indians making those treaties and of the officials and representatives of the United States that the width of the outlet was 10 miles and the length 150 miles.

30. The outlet, when acquired and when ceded by the Delaware Nation, was 10 miles in width and 150 miles in length, consisting of 960,000 acres. [3 Ind.Cl.Comm. 622, 632–33.]

Based on the evidence and these findings, the Commission held:

Evaluating the foregoing, we think the weight of the evidence supports the defendant in its contention that Isaac McCoy thought that he had surveyed the outlet far enough to meet

the requirements and purpose of the treaty, because he was 40 or 50 miles within the buffalo country (petitioners in Docket 241 admit that the 150 mile point was 50 miles or more within the buffalo country—see Reply Brief, p. 133) and that the approval of his surveys by the Delawares and by the President of the United States established his 150 mile terminal as the western limit of the outlet; and that our findings 29 and 30 are warranted. [3 Ind.Cl.Comm. 634, 657.]

IT IS HEREBY ORDERED AND DECREED that the Delaware Nation in 1854 had title to and ceded to the United States the outlet provided for in the Treaty of September 24, 1829 (7 Stat. 327) and said outlet comprised a tract of land 10 miles in width and 150 miles in length consisting of 960,000 acres of land; * * *.

We conclude that the decision of the Commission on this question is correct and is supported by substantial evidence.

IV

*The Allowance of the $150,000 Settlement Payment as an Offset to the Award of the Delawares*

 The Delawares contend on their cross-appeal that the Commission erred in allowing as an offset the payment to the tribe of $150,000 by the government in settlement of prior cases. They allege that under a special jurisdictional act of July 1, 1902 (32 Stat. 716, 726), twelve petitions were filed by the plaintiffs in this court, one of which sought compensation for the outlet lands, but at least six of the cases were unrelated to any of the claims which were filed under the Indian Claims Commission Act. All twelve cases were settled and released for a lump sum payment of $150,000. The plaintiffs contend that all of this amount should not be allowed as an offset in this case because some of the claims that were settled bore no relationship to the present claim. It claims that an allocation should be made on the basis of the amounts claimed in the earlier suits, and asks that this part of the case be remanded to the Commission for disposition on this basis. The Commission made findings on this question as follows:

54. By Section 68 of an Act of July 1, 1902 (32 Stat. 716, 726), Congress conferred jurisdiction upon the Court of Claims to examine, consider, and adjudicate " * * * any claim which the Cherokee Tribe, or any band thereof, arising under Treaty stipulations may have against the United States.

* * * "

Pursuant to the authority of this Act the Delaware Tribe filed twelve Petitions in the Court of Claims, numbered 23104, 23162, 24067, 24645, and 24926 through 24933. Of these, Petition No. 24928 comprehended the Delaware Outlet claim. In order to buy peace from the potential litigation represented by these twelve Petitions, the United States elected to settle all twelve claims by an aggregate payment of $150,000.00, which sum was appropriated by Section 21 of an Act of April 21, 1904 (33 Stat. 222), and subsequently disbursed to the Delaware Indians. [*Id.* at 30.]

The Petitions were dismissed by stipulation of the parties on January 9, 1905.

55. The release which the United States secured for the price of $150,-000.00 was a payment on the claim and, as such, must be deducted from one—but only one—judgment secured by the Delaware Indians. Since the cases at bar are ripe for final judgment, the $150,000.00 payment on the claim has been deducted from the earlier award of $607,980.00, with the result that the gross [pre-offset] award is $457,980.-00. In the event that the Delaware Indians secure a money judgment against the United States on some other cause of action at some future date, this payment on the claim will not be available to the United States for pleading in reduction of such other money judgment. [*Id.* at 31.]

Based on the foregoing findings, the Commission held:

> Since the $150,000.00 was a payment on the claim, and since the payment was in fact received by the Plaintiffs, we regard it as a compulsory counterclaim which must be deducted from the judgment before this Commission can reach the question of discretionary allowable offsets. Accordingly, the gross judgment of $607,980.00 (*Delaware Tribe,* supra, 8 Ind.Cl.Comm. 150, at 194) must be adjusted downward to reflet deduction of this counterclaim. The Findings of Fact this day issued reflect the adjustment in showing that the judgment from which allowable offsets, if any, are to be deducted is $457,980.00. [*Id.* at 19.]

We conclude that the settlement was made of the twelve cases, including the claim for the outlet lands, without any apportionment and that by such settlement, the money was paid on all the claims, including the one before us, and the amount paid ($150,000) must be credited on the present award. The decision of the Commission is correct, and is supported by substantial evidence.

## V

### *Conclusion*

We affirm the decision of the Commission in all respects and hold it is supported by substantial evidence, except that portion of it denying the allowance of the general gratuities in the sum of $72,600.37 as offsets under its newly promulgated five percent rule, which we disapprove. We remand this part of the case to the Commission for its determination of the allowability or denial of such gratuities as offsets under its equity and good conscience powers on an item-by-item basis.

Affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion.

NICHOLS, Judge (concurring):

I join in most of the opinion and in the judgment of the court but I would like to add some comment to the opinion respecting issue I, that is, "Adopting an arbitrary rule governing the allowance of gratuitous offsets." The supposed arbitrary rule is that in case of the overreaching of an Indian Tribe by acquisition of its lands at an unconscionable consideration, the Commission will not allow "gratuities" for subsistence of the tribe except to the extent the "gratuities" for any year exceed 5% of the deficiency in consideration, as it is supposed the tribe, if adequately paid, could have financed its own subsistence to that extent at least. This rule, announced June 4, 1969, I fear has by this time been applied, as the Commission said it would be, in numerous cases.

The Commission is authorized to allow an offset for gratuitous expenditures only if it finds that "the entire course of dealings and accounts between the United States and the claimant in good conscience warrants such action", 25 U.S.C. § 70a. As I read the Commission's analysis of the problem, it cannot persuade its conscience that the instant offset is warranted, in light of facts it sets out in its opinion. If the matter were *res integra*, I would agree. This court points out that the conscience of the Commission, as previously constituted, and of this court, were not troubled by similar allowances in prior years. Undoubtedly, guilt and self-abasement over wrongs to Indians were rooted in the national psyche by 1946, as the cited Act itself demonstrates, but were then nothing to what they have become today. Thus a decision that satisfied the conscience in 1946 may fail to do so now. Undoubtedly, to the Commission, their decision appears as a perfectly straight-forward exercise of the powers delegated to them by Congress.

I believe that in answer this court should explain what it thinks "good conscience" means, instead of just what it does not mean. Suppose the Commission takes up the gratuities one by one (and, as I understand it, the items

listed in Finding 60 are not individual gratuities, but the totals for each year of maybe hundreds), and declares that the Government has failed to show they are justified in good conscience, the state of the Commission's conscience being what it is. What have we said to show whether this is right or wrong? The expiration of the Commission's charter is now just over the horizon and in remanding a case we ought to specify enough so that we need not remand it again.

I start with the proposition that the words "good conscience" have strong overtones of the principles of equity. Equity courts were called courts "of conscience." The Congress was thinking about equity: in this § 70a to be construed it mentions "equity" four times, always set off against "law" and finally allows "claims based upon fair and honorable dealings that are not recognized by any existing *rule* of law or *equity*" (emphasis supplied). Equity had a body of rules separate from law and in the Federal courts up to 1938 equity cases were adjudicated in an entirely distinct type of proceeding. Undoubtedly, the "chancellor" or his American counterpart had more freedom than a law judge had to apply his conscience as a guide to the decision of individual cases. But the very use of the word "rule" implies that the "chancellor" was never, within the fully developed system of separate equity jurisprudence, free to decide cases solely by the light of his own individual conscience or to do just as seemed right to him. He studied the decided cases and followed them just as the law judge would. From the time of Charles II's restoration, approximately, equity was simply a "recognized part of the law of the land." Before that time "chancellors" may have adjudicated without much reference to case law, for cases were not adequately reported, but they had in mind the idea of a "law of nature," and maxims of jurisprudence borrowed from the canonists or ci-vilians, as well as, of course, the English common law.

As authority for the above paragraph, if wanted, see generally, Chafee and Re's excellent Cases and Materials on Equity (5th Ed. 1967).

There are special reasons for a close following of precedents applicable to this particular Act. We are not concerned with a constitution designed to endure "for ages to come" and consequently requiring adjustment in meaning from time to time to meet contemporary requirements as judicially conceived. Here we have a special charter written to be fully executed on or before April 10, 1972 (25 U.S.C. § 70v, as amended April 10, 1967). The purpose of it we have recently considered in Gila River Pima-Maricopa Indian Community, et al. v. United States, 427 F.2d 1194, 190 Ct.Cl. 790 (decided February 20, 1970). It was to gather together all claims of Indian tribes accrued before 1946, such as had previously been decided under special acts, not always consistent in language, and to obtain their final adjudication on uniform principles so that neither Congress nor the courts would be troubled with them anymore. A change in the principles of decision during the life of the charter would frustrate this purpose because tribes subjected to adverse decisions in the early part of the work, according to rules later abandoned, surely would have in such discrimination an irrefutable argument for new special legislation. Judge Davis, concurring in the above case, said (427 F.2d p. 1200):

* * * But it would be wrong for judges to read into the Indian Claims Commission Act, passed almost twenty-five years ago, currents of thought which are emerging today but were not infused into that 1946 statute. * * *

Besides the legislative history, the suits brought by attorneys who had been instrumental in obtaining passage of the legislation were a persuasive indication of what jurisdiction the Congress intended to create.

Thus it appears to me that the Commission's conscience, speaking as of 1969, is no warrant for putting forward new rules contrary to prior practice for the allowance or disallowance of offsets, and this is true even though a 5% exclusion was never specifically proposed and specifically rejected in cases prior to this. It will be necessary to consider the past cases, establish how offsets were dealt with in them, and deduce rules therefrom to govern disposition of the Commission's remaining caseload. If the precedents are conflicting, this is no new problem for a court of equity, and to resolve them is better than to create new conflicts.

I would also add that the Commission is apparently to exercise its conscience respecting offsets according to "the nature of the claim and the entire course of dealings and accounts between the United States and the claimant." I do not read this as necessarily requiring investigation of the equities respecting each separate Government sack of peanuts the tribe may have consumed. With all respect, it seems to me the language may visualize what might be called offsets against offsets, i. e., that wrongs not permissibly the subject of direct claims might be considered as "in good conscience" an insuperable objection to allowance of offsets. Item by item inquiries seem more appropriate when the issue is e. g., whether the expenditure was for the benefit of the tribe not when it relates to "good conscience."

Therefore, it could be the findings might be restructured to justify the result the Commission wishes to reach without the detailed investigation Judge Skelton visualizes. But the Commission simply cannot seize on the wrong of defendant in frustrating the allowance of interest by having paid $10,000 instead of zero, as being of itself a "good con-

science" bar, because the precedents are against it.

LARAMORE, Judge, joins in the foregoing concurring opinion.

DAVIS, Judge (dissenting in part):

My disagreement concerns Part I of the court's opinion, "The Commission's Five Percent Rule for Allowing or Denying General Gratuities of the Government as Offsets", and within that portion of the opinion is narrowed to the directive that the Indian Claims Commission must exercise its discretion with respect to offset gratuities on an "item-by-item" basis, I agree with the rejection of the automatic "five percent rule", as well as with the requirement that each case be considered separately. But like Judge Nichols I cannot concur that within a case there must always be item-by-item inquiries. The offset provision of the Indian Claims Commission Act, 25 U.S.C. § 70a,[1] plainly envisages instances in which all gratuities can be disallowed on an over-all basis and others in which certain classes of gratuities can be rejected for reasons of history or conscience.

In this case, for instance, I would think it entirely proper, if the facts warrant it, for the Commission to find, on remand, that, wholly apart from interest, if the Delawares had received $607,980 as a result of the cession of 1854, instead of $10,000, they would not have needed all or part of the subsistence-related payments (from 1860 to 1942) which the Government is seeking to offset. If the Tribe, that is, had received over $600,000 in the middle of the 19th century, as they should have, perhaps they could and would have used that money for subsistence-related purposes, so that the Federal Government would not have had to feed and take care of them in the way it did when they re-

---

1. " * * * the Commission may also inquire into and consider all money or property given to or funds expended gratuitously for the benefit of the claimant and *if it finds that the nature of the claim and the entire course of dealings and ac-*

*counts between the United States and the claimant in good conscience warrants such action,* may set off *all or part* of such expenditures against any award made to the claimant * * * (emphasis added).

ceived only $10,000.[2] If that was so, I see no reason why the Commission cannot exercise its discretion to deny those offsets, as a whole, under 25 U.S.C. § 70a. The same may be true of other cases.

It is entirely wrong, in my view, to hobble the Commission, in this or any case, with instructions to comb the gratuities item-by-item. Mechanical rules are not to be applied, but otherwise the Commission should be free to apply the statutory criteria, in any particular case, to all items or groups of items. I cannot believe that the court really means what the opinion seems to say, or that it can or will abide by an iron item-by-item rule in the future.

2. The figures as to these "gratuitous" expenditures, when related to money payments by the Government to the Delawares on other claims, give rise to the suggestion, at least *prima facie*, that the Indians needed subsistence-related help most when they had least money of their own.