Davis, Judge,
delivered the opinion of the court:
The Lipan and Mescalero Apache tribes invoke the Indian Claims Commission Act, 25 TJ.S.C. § 70a (1964), for compensation for the loss of their ancestral lands within the State of Texas. They seek to hold the United States responsible for the actions of its officers, agents, and troops who in 1858 and 1859 — appellants allege — joined with Texas forces to drive the Indians from their lands. They also claim that the Federal Government is liable for its failure to intervene (when it was under an alleged duty to do so) to protect their lands from being settled under the State’s public lands program.
*491 The Indian Claims Commission granted the Government’s motion to dismiss the petition for failure to state a cause of action under the Act. It held that these Indians had no right of occupancy to the lands because such a right had not been accorded by the Republic of Texas, prior to annexation in 1845, and therefore did not exist after Texas’ admission into the Union; and, even if the appellants possessed such rights, they could not recover in this suit against the United States which, before and after annexation, did not have any proprietary interest in the public lands of Texas.
I
On this motion to dismiss we must accept the factual allegation that the claimant tribes had used and occupied designated lands in Texas to the exclusion of other peoples for many years. Such continuous and exclusive use of property is sufficient, unless duly extinguished, to establish Indian or aboriginal title. See, e.g., Sac and Fox Tribe v. United States, 179 Ct. Cl. 8, 21-22 (1967), and cases cited. We know that, prior to the creation of the Republic of Texas in 1836, the previous sovereigns, Spain and Mexico (and France, to some extent), did not cut off the aboriginal rights of the Indians within their territories on the North American continent. The Supreme Court has clearly indicated that lands formerly under Spanish, Mexican, or French sovereignty are not to be treated differently, for purposes of determining Indian title, from other property within this nation. United States v. Santa Fe Pac. R.R., 314 U.S. 339, 345-46 (1941). In each instance, Indian possession, when proved, must be accorded proper respect. Johnson v. M'Intosh, 21 U.S. (8 Wheat.) 543, 571, 574, 592 (1823); Mohave Tribe v. United States, 7 Ind. Cl. Comm. 219, 260-61 (1959); Washoe Tribe v. United States, 7 Ind. Cl. Comm. 266, 288 (1959).
The Claims Commission has found, however, that, even if the claimants had once possessed aboriginal title to the lands, that right of occupancy was lost after 1836 when Texas became an independent country. The Commission appeared to believe that the survival of aboriginal title depends upon affirmative recognition by the sovereign and that the Republic “did not accord the Indian[s] the right of occupancy * * *492 without such a right to lands in Texas, at the time of annexation, the tribes failed to prove a necessary element of their cause of action and were barred from recovery.
To the extent that the Commission and the appellee believe that affirmative governmental recognition or approval is a prerequisite to the existence of original title, we think they err. Indian title based on aboriginal possession does not depend upon sovereign recognition or affirmative acceptance for its survival. Once established in fact, it endures until extinguished or abandoned. United States v. Santa Fe Pac. R.R., supra, 314 U.S. at 345, 347. It is “entitled to the respect of all courts until it should be legitimately extinguished * * Johnson v. M'Intosh, supra, 21 U.S. (8 Wheat.) at 592. See Clark v. Smith, 38 U.S. (13 Pet.) 195, 201 (1839); Worcester v. State of Georgia, 31 U.S. (6 Pet.) 405, 420, 439 (1832); Mohave Tribe v. United States, supra, 7 Ind. Cl. Comm. at 262.
The correct inquiry is, not whether the Republic of Texas accorded or granted the Indians any rights, but whether that sovereign extinguished their pre-existing occupancy rights. Extinguishment can take several forms; it can be effected “by treaty, by the sword, by purchase, by the exercise of complete dominion adverse to the right of occupancy, or otherwise * * United States v. Santa Fe Pac. R.R., supra, 314 U.S. at 347. While the selection of a means is a governmental prerogative, the actual act (or acts) of ex-tinguishment must be plain and unambiguous. In the absence of a “clear and plain indication” in the public records that the sovereign “intended to extinguish all of the [claimants’] rights” in their property, Indian title continues. Id. at 353.
The materials considered by the Commission and presented to this court do not show the required clear and plain indication that the Republic ended claimants’ rights in their ancient lands.[1] The starting points are the double historical *493 facts that tbe law of tbe prior sovereigns (Spain, Mexico, and to a limited degree France) accepted aboriginal ownership, and that all tbe colonizing European powers took tbe same position. See Johnson v. M'Intosh, supra, 21 U.S. (8 Wheat.) at 571-603; Tee-Hit-Ton Indians v. United States, 348 U.S. 272, 279-81 (1955); Sac and Fox Tribe v. United States, supra, 179 Ct. Cl. at 21. “[T]he right of sovereignty over discovered land was always subject to tbe right of use and occupancy and enjoyment of the land by Indians living on the land.” Sac and Fox Tribe v. United States, supra. The Supreme Court has recognized this, explicitly or implicitly, in dealing with territory in this country acquired from various other nations. Worcester v. State of Georgia, supra, 31 U.S. (6 Pet.) 405 (original States); Chouteau, v. Molony, 57 U.S. (16 How.) 203 (1853) (Louisiana Purchase); Holden v. Jay, 84 U.S. (17 Wall.) 211, 236 (1872) (same); Cramer v. United States, 261 U.S. 219 (1923) (Mexican Cession); United States v. Santa Fe Pac. R.R., supra, 314 U.S. 339 (1941) (same); Mitchel v. United States, 34 U.S. (9 Pet.) 536 (1835) (Florida); United States v. Tillamooks, 329 U.S. 40 (1946) (Oregon); Tee-Hit-Ton Indians v. United States, supra, 348 U.S. 272 (Alaska). As these cases prove, the United States has followed the same policy in its own intercourse with Indians. Only a convincing demonstration could show that the Republic of Texas uniquely departed from this consensus of the whole western world.
The appellee’s scattered references do not add up to such a convincing showing. We are directed to the Republic’s course of dealings with the Cherokee Indians. In 1835, the Consultation, the governing authority preceding the formation of the Provisional Government, recognized that the Cherokees had derived rights to their lands from the Mexican Government; that the governor and general council of the Texas Republic, when established, would guarantee peaceable enjoyment of their rights; and that “they [the Cherokees] are entitled to our commiseration and protection, as the just owners of the soil.” [2] Although the Provisional Government negotiated a treaty with the Cherokees recog *494 nizing such property rights, the Senate of the Republic, on December 26,1837, declared that act null and void, claiming that the Mexican Government had never granted such property to the Cherokees and the previous acts of the Consultation were without authority. Appellee infers that the refusal to ratify the treaty illustrated the Republic’s policy of ex-tinguishment of all Indian title. This argument is surely too broad. The motives of a legislature are often difficult to discover. The ill-fated treaty dealt specifically with the Cherokees and with no other Indian tribe. Moreover, its subject matter was property rights said to have been bestowed, affirmatively, by the Mexican Government, not aboriginal rights existing independently of grants by the sovereign.
The Government also relies upon broad policy statements of President Lamar, the second chief executive of the Republic, and on certain legislation enacted during his tenure (December 1838-December 1841). He may have advocated expulsion or extermination of hostile Indians, and resettlement on reservations for friendly ones, but his words and speeches would not, in themselves, amount to an extinguishment of Indian title. (The other Presidents of the Republic did not follow or announce the same policy.) An Act of the Republic of Texas (1840) did authorize the President to survey vacant lands on which all the “friendly Indians within the Republic shall be placed as soon as circumstances permit.” Appellee argues that this enactment is inconsistent with governmental acquiescence in Indian title and thereby effects extinguishment. We cannot declare, however, that the contemplation of possible future action contingent on other circumstances is clear evidence of present extinguishment. The 1840 Act looks to the future; its words embody a delegation of authority to the executive to act if and when he considers it appropriate. It does not purport to affix or alter any rights as of the moment.
Finally, the Government would have us hold that extin-guishment occurred in 1845. Under treaties negotiated in 1843 and 1844 the Republic established a series of trading posts to foster trade and commerce with the Indians. On February 3, 1845, the appellee contends, the Republic’s legislature made it evident that these posts were to comprise *495 a flexible line to be moved as settlements were extended (Laws of Republic of Texas (9th Cong.), p. 92) — suggesting that the Indians, rather than holding possessory rights, were on the Texas lands only at the pleasure of the Republic. For additional support, several administrative reports are quoted. On March 2,1845, the Superintendent of Indian Affairs for the Republic advised the Indian Agent for the Lipan that the tribe was on the Cibalo River and that “They have permission to remain there for the present, until further orders.” On September 27,1845, it was reported to Anson Jones, then President of the Republic, that “the Lipan * * * Indians have consented to leave their present location and remove within the limits of the Comanches who have given their assent to it,” and on December 12th, “The Lipan have been removed from the San Antonio River to the San Gabriel.”
These fragmentary materials do not indicate that the Texas Republic, in 1845, altered its previous practice and adopted a policy of extinguishing all aboriginal title. The very words of the administrative reports show that the officials sought and obtained the consent of each of the tribes affected before the actual relocation. Such precautionary measures are as consistent with a policy of acceptance of, or acquiescence in, Indian title as the converse. At most, the reports indicate that the Lipans, by agreeing to resettle near the San Gabriel River, relinquished aboriginal title to land in the vicinity of the San Antonio River. See Buttz v. Northern Pac. R.R., 119 U.S. 55, 69-70 (1886). But appellants’ present claim does not encompass this territory; it refers to land north and east of the controverted tract which was used and occupied prior to 1845, but continues that “by reason of the pressure of the Comanche tribe and the establishment of frontier settlements in Texas along the Gulf, by 1845, the Lipan were confined to the use and occupancy of the said described tract.” The reports relied upon by the Government, therefore, do not relate to property currently at issue.
Thus, the materials the appellee cites are weak and equivocal. On the other hand, there are a number of indications that the Republic, for much of its brief history, adopted the general policy of encouraging peaceful relations with the Indians and of discouraging mutual encroachments — a *496 policy seemingly inconsistent with one bent on tbe abrogation of Indian title. General Houston, who served as President from October 1836 to December 1838 and again from December 1841 to December 1844, supported “treaties of peace and amity” and “maintenance of good faitli with, the Indians”, opposed “aggression”, and sought to establish “commerce with the different tribes.” [3] He advocated the establishment of trading houses on the frontiers, and the Texas Congress ultimately complied. This 1843 law provided that “no person or persons shall, without special permission of the President, pass the line of trading houses * * *; nor shall any person or persons reside among, or remain within the limits of the territory assigned to the Indians, unless by express direction of the President”, and “the Indians shall not come below the line of their territory, without the special permission of an agent” (An Act “To provide for the establishment and maintenance of peace, and to regulate friendly intercourse with the Indians”, 1843, Gammel, II Laws of Republic of Texas, pp. 842-45, Secs. 15, 16). Treaties of peace and friendship, in 1843, 1844, and 1845, similarly provided for a line of trading houses and prohibited the mutual passing of this line without permission; again, the treaties significantly referred to “the territory assigned to the Indians” and “the hunting grounds of the Indians.” By themselves, such materials might not be enough to prove an affirmative grant or recognition by the Republic of Indian title, but we think they have considerable weight in countering the Government’s contention that the Republic definitely 'abrogated the tribes’ pre-existing aboriginal ownership. On the whole of the available materials, we must conclude that history is decidedly against the appellee.
II
Since there is insufficient proof of extinguishment by the Republic, the claimant tribes necessarily possessed Indian title, based on aboriginal occupancy, when Texas attained statehood on December 29, 1845. Under the terms of its admission, it retained “all the vacant and unappropriated lands *497 lying within its limits.” Joint Resolution of March. 1, 1845, 5 Stat. 797; Joint Resolution of December 29, 1845, 9 Stat. 108. Appellee argues, on the basis of this provision, that since the new State, not the Federal Government, held the ultimate legal fee to the public lands, the State legislature could extinguish Indian title 'at will. The first legislature may have attempted just that when, on April 29, 1846, it declared that it recognized no title at all in Indian tribes within the State of Texas.
Our view is different: that the State could not extinguish Indian title (at least without the Indians’ consent) and that only the Federal Government had the power, to abrogate aboriginal ownership by unilateral action. It makes no difference that the lands were State-owned; the Federal Government’s power stemmed, not from the ownership of public lands in this instance, but more importantly from the general grant of the right to deal with Indians. The Constitution has vested in the national government the authority to regulate Indian affairs:
“That instrument confers on congress the powers of war and peace; of making treaties, and of regulating commerce with foreign nations, and among the several States, and with the Indian tribes. These powers comprehend all that is required for the regulation of our intercourse with the Indians. They are not limited by any restrictions on their free actions.” Worcester v. State of Georgia, supra, 31 U.S. (6 Pet.) at 438.
One aspect of this federal authority is clearly the power to extinguish Indian title.
The many decisions in this area do not speak in conventional property terms — inquiring into the powers of the holder of the fee title — but are broadly concerned with those powers which are conferred upon the sovereign by the nation’s basic law. “The power of Congress * * * [to extinguish Indian title] is supreme * * *. As stated by Chief Justice Marshall in Johnson v. McIntosh, supra, p. 586, ‘the exclusive right of the United States to extinguish’ Indian title has never been doubted.” United States v. Santa Fe Pac. R.R., supra, 314 U.S. at 347. This has been held by the Supreme Court from the beginning. See Worcester v. State *498 of Georgia, supra; Clark v. Smith, 38 U.S. (13 Pet.) 195, 201 (1839); Buttz v. Northern Pac. R.R., supra, 119 U.S. 55, 66 (1886); Cramer v. United States, 261 U.S. 219, 227 (1923); United States v. Santa Fe Pac. R.R., supra.
Appellee attempts to avoid the weight of precedent by reinterpreting two of the Court’s seminal decisions — Worcester v. State of Georgia and Johnson v. M'Intosh. In Worcester, it is said, the source of the Federal Government’s power to extinguish title was not its status as sovereign, but a compact between the State of Georgia (the fee holder) and the United States by which the State authorized the Federal Government to act. Chief Justice Marshall clearly indicated, however, that the 1802 compact was merely evidence “tending to prove * * * [Georgia’s] acquiescence in the universal conviction that the Indian nations possessed a full right to the lands they occupied, until that right should be extinguished by the United States * * Id. at 439'. Moreover, one of the treaties (Treaty of Aug. 7, 1790, 7 Stat. 35) by which the United States extinguished Indian title in Georgia land was made before the 1802 compact had been concluded — further evidence of acceptance of this “universal conviction.”
The Government also urges that the Court, in Santa Fe Pac. R.R., misconstrued Chief Justice Marshall’s words in J ohnson v. MPntosh. It submits that J ohnson dealt only with lands held by the United States and therefore that the Court did not reach the issue now at bar. Whatever the particular facts of the Johnson case, we think that the Chief Justice’s opinions, in both that and the subsequent Worcester decision, plainly confirm the exclusive power of the United States to extinguish Indian title even if the ultimate legal fee holder is a State. Santa Fe Pac. R.R. reaffirms this longstanding practice. Appellee cites Seneca Nation v. Christy, 126 N.Y. 122, 137, 27 N.E. 275-79 (1891), writ of error dismissed, 162 U.S. 283 (1896), as declaring that the thirteen original States (which retained their public lands) had the power to extinguish Indian title, but that court’s statement refers, at most, to extinguishment by agreement with the Indians. We have been cited to no authority holding or suggesting that any State has had the power to abrogate Indian ownership in iwoitum. That drastic power resides solely in the United *499 States which is charged by the Constitution with oversight of Indian matters.
The State of Texas is not excepted from the rule applicable to all other States. It entered the Union on an “equal footing” with the others (United States v. Texas, 339 U.S. 707 (1950)) and “the United States then took her place as respects foreign commerce, the waging of war, the making of treaties, defense of the shores, and the like.” Id. at 717-18. The State’s retention of its public domain no more meant that it kept its pre-admission power over Indians than the like retention by the original States of their lands precluded the Federal Government’s authority. Worcester v. State of Georgia, supra. Prior to Texas’ admission there may have been doubts on this score, but they have long since been set to rest by the post-admission history and the “equal footing” doctrine.
Since the State of Texas was thus without power, and no one contends that the United States extinguished claimants’ aboriginal title, we hold that the Lipan and Mescalero Apache tribes, if they prove the necessary possession, had a right of occupancy to the controverted lands when the alleged illegal acts were committed in the 1850’s.
Ill
The problem then is whether the United States can be held liable in this proceeding for violating the appellants’ aboriginal rights of ownership. The Indians have stated two possible bases for recovery. First, they say that in 1858 and 1859 open warfare broke out in which United States officers, agents, and troops joined with Texas forces to drive the Apaches from their lands. Second, they claim the United States should be held to account for its failure to intervene (when it was under un alleged duty so to act) to protect their lands from being settled under the State of Texas’ public lands program. The Claims Commission held that these assertions fail to state causes of action against the Government because the United States has never held a proprietary interest in the Texas lands.
While such a finding of government ownership might have been required before Congress promulgated the Indian Claims Commission Act, it is no longer a prerequisite to every *500 suit.[4] We have often, noted, that the Claims Commission Act affords new causes of action recognizing liability in the United States where none had previously existed. See, e.g., Creek Nation v. United States, 168 Ct. Cl. 483, 489 (1964); United States v. Seminole Nation, 146 Ct. Cl. 171, 178, 173 F. Supp. 784, 788-89 (1959). These new causes of action extend to “extra-legal or moral claims of Indians against the United States * * Otoe & Missouria Tribe v. United
States, 131 Ct. Cl. 593, 621, 131 F. Supp. 265, 283 (1955), cert. denied, 350 U.S. 848. Our previous rulings clearly indicate that under the Act the United States, even though it never had title to the disputed land, may be held responsible for damage caused to Indian tribes with respect to that land. The crucial test is not ownership but whether the demonstrated course of dealings successfully ties the central government to the damage inflicted, albeit by another. Six Nations v. United States, 173 Ct. Cl. 899, 904 (1965). See also, Seneca Nation v. United States, 173 Ct. Cl. 912 (1965); Seneca Nation v. United States, 173 Ct. Cl. 917 (1965).
Claimants’ first allegation that United States troops drove the Apache tribes from certain of their lands properly states a cause of action under clause (4) or (5) of section 2 of the Act. Under the Treaty of May 15, 1846 (ratified March 8, 1847, 9 Stat. 844), concluded beween the United States and several Texas Indian tribes, including the “Lepan” (sic), the Indians acknowledged “themselves to be under the protection of the United States, and of no other power, state, *501 or sovereignty whatever” (Art. I). In 1852, the Apache Indians, including the Mesoaleros, entered into a treaty of “perpetual peace and amity” with the United States, by which the Indians declared that “they are lawfully and exclusively under the laws, jurisdiction, and government of the United States of America, and to its power and authority they do hereby submit” (Treaty of July 1, 1852, ratified March 25, 1853, 10 Stat. 979). See Mescalero Apache Tribe v. United States, 17 Ind. Cl. Comm. 100, 114 (1966). While such treaty statements are insufficient to hold the Federal Government liable as a fiduciary for abridgement of the Indians’ rights by a third party, they suffice to protect claimants from the compulsory acquisition of their property by or through the United States. Six Nations v. United States, supra, 173 Ct. Cl. at 906; Seneca Nation v. United States, 173 Ct. Cl. 917, 922 n.5 (1965). “Protection does not imply the destruction of the protected.” Worcester v. State of Georgia, supra, 31 U.S. (6 Pet.) at 433.
The compensable wrong, if proven, would be the conduct of the United States troops and officials in driving the claimants from their property. Clause (4) of the Act (“claims arising from the taking by the United States, whether as the result of a treaty of cession or otherwise, of lands owned or occupied by the claimant without the payment for such lands of compensation agreed to by the claimant”) was intended to embrace such claims based on the taking of lands which were held by Indian title, regardless of whether the lands were taken for the Government’s own use or for others. Upper Chehalis Tribe v. United States, 140 Ct. Cl. 192, 197-98, 155 F. Supp. 226, 229 (1957); Snake or Piute Indians v. United States, 125 Ct. Cl. 241, 112 F. Supp. 543 (1953); Nooksack Tribe v. United States, 162 Ct. Cl. 712, 715 (1963), cert. denied, 375 U.S. 993 (1964); Miami Tribe of Oklahoma v. United States, 150 Ct. Cl. 725, 743, 281 F. 2d 202, 212 (1960), cert. denied, 366 U.S. 924 (1961). See United States v. Creek Nation, 295 U.S. 103, 110 (1935). Such conduct would also violate clause (5) (“claims based upon fair and honorable dealings that are not recognized by any existing rule of law or equity.”). Appellants, to recover under this claim, must show to the Commission’s satisfaction that the United States *502 forces or officials drove them from lands to which they held Indian title.
Appellants’ second claim, under clause (5), raises the issue of whether the United States can be held liable for its failure to protect them from the acquisition and distribution of their lands to white settlers under Texas’ public land laws. Under the Act, the United States might be liable in damages for the actions of a third party. The required nexus for liability could rest upon the Government’s “true concert, partnership, or control” with, or of, the party dealing with the Indians (Six Nations v. United States, supra, 173 Ct. Cl. at 908), or an established special relationship between the Government and claimant Indians affecting the controverted subject matter. Id. at 905; Seneca Nation v. United States, 173 Ct. Cl. 917, 925-26 (1965); Oneida Tribe v. United States, 165 Ct. Cl. 487, 492-94 (1964), cert. denied, 379 U.S. 946. In any event, the United States is held liable under this “fair and honorable dealings” clause, not because it has title to the property, but because, by its own acts, it has undertaken special duties which it has failed to fulfill.
The tribes insist that the United States, by statutes, treaties, and representations of its agents, undertook to protect their occupancy rights from the alleged encroachments. It is essential, therefore, to determine if a special relationship was created; the nature and scope of any responsibilities assumed by the United States; and whether the Federal Government met these obligations. The answers to these issues are not readily apparent from the materials presented to this court, but it is clear that the petition should not have been dismissed at this stage. We, therefore, remand the case to the Indian Claims Commission to make the necessary findings on these issues — as well as on the existence and extent, if any, of the appellants’ aboriginal ownership, and the other questions remaining in the case. Spokane Tribe v. United States, 163 Ct. Cl. 58, 70 (1963); Snake or Piute Indians v. United States, supra, 125 Ct. Cl. at 255, 112 F. Supp. at 552.

Reversed and remanded.

 It is proper to take Judicial notice of the laws and other public acts of the Republic of Texas. Unites States v. Louisiana, 363 U.S. 1, 12, 36-64 (1960); United States v. Fullard-Leo, 331 U.S. 256, 269 (1947); United States v. Perot, 98 U.S. 428, 430 (1878). We can also proceed to determine this issue rather than seek further elucidation from the Commission, upon review of the historical materials, in the light of the proper legal standard, we feel that only one conclusion is acceptable. See Spokane Tribe v. United States, 163 Ct. Cl. 58, 70 (1963).

 The Consultation’s decree was before the Indian Claims Commission in Texas-Cherokees v. United States, 2 Ind. Cl. Comm. 516, 517-18 (1953).

 The quotations are from his first inaugural address in October 1886.

 The Commission placed special reliance on this court’s decision in Wichita, Indians v. United States, 89 Ct. Cl. 378 (1939), in which we refused to- hold the ün-ited States liable for removing Indians from the lands in Texas “for their own protection and safety * * »” (421). The opinion first found that the claim of original title “is not sustained by the evidence and cannot be allowed” (89 Ct. Cl. at 414, 416), but later said (at 422), that “In these circumstances the united States cannot be held liable to compensate these Indians for the loss of their lands in the State of Texas, in and to which the united States had no right, title or interest before or after the Indians were compelled to abandon them.” This decision, rendered under a special Jurisdictional act, did not, of course, take into account the new causes of action subsequently created by the Indian Claims Commission Act and should not be interpreted as limiting the scope of the remedies affored by that Act. Moreover, the court, in Wichita, may well have held as it did because it found that the united States was not responsible for removing the Indians. Immediately before declaring that "in these circumstances the United States cannot be held liable” (emphasis added), the opinion says (at 421-22), “The citizens of Texas were responsible for the removal of the affiliated bands to Oklahoma, as shown by the annual report of the Commissioner of Indian Affairs, 1859.”