NICHOLS, Circuit Judge.
 

 I
 

 Issues
 

 These consolidated cases are before the court on appeal from a judgment
 
 *
 
 of the United States Claims Court dismissing the petitions of the Wichita Tribe and its affiliated bands and groups for compensation from the United States for the taking of lands held by aboriginal title. In his recommended decision, Senior Trial Judge Mastin G. White concluded that when the United States acquired sovereignty over the lands in Kansas, Oklahoma, and Texas (in 1803, 1803, and 1845, respectively), the Wichitas did not hold aboriginal title to any portion of these lands. Neither the parties nor the trial judge dispute the fact that at some earlier dates the Wichitas had held aboriginal title to various tracts of the claimed lands. The sole issue we are to decide is whether the Wichitas had lost such title to all their lands prior to the times United States sovereignty attached. We hold in Part III of this opinion that the Wichitas did retain aboriginal title to some of these lands. Although the trial judge’s decision is undoubtedly correct as applied to substantial parts of the claimed area, his own findings of fact seem to acknowledge that, at the least, the Wichitas held aboriginal title to land in the Spanish Fort area around the Red River in Oklahoma from well before to well after 1803. The record is devoid of
 
 *1379
 
 evidence to support the conclusion that they were without aboriginal title to any lands on the relevant dates. We therefore reverse and remand these cases to the Claims Court for a determination of the extent of aboriginal title and the extent of liability of the United States, if any, for land to which the claimants had such title.
 

 II
 

 Facts
 

 A.
 
 Procedural History
 

 Appellants originally brought their claims in two administrative proceedings before the Indian Claims Commission pursuant to a special jurisdictional act approved March 21, 1978 (Pub.L. No. 95-247; 92 Stat. 158). This act authorized them to file claims out of time against the United States under the provisions of the Indian Claims Commission Act (60 Stat. 1049; 25 U.S.C. § 70a), for lands taken without adequate compensation. The March 21,1978, jurisdictional act grouped the affiliated Wichita, Keechi, Tawakonie, and Waco bands under the rubric, “Wichita Indian Tribe” (hereinafter “Wichitas”), treating them as a single claimant and providing that “no affiliated band or group may bring a claim not held in common with the Wichita Indian Tribe.” (Pub.L. No. 95-247; 92 Stat. 158).
 

 The Indian Claims Commission later transferred the two proceedings to the United States Court of Claims for final disposition under the authority of the Act of October 8, 1976 (90 Stat. 1990; 25 U.S.C. § 70v). Upon filing, the trial division of the Court of Claims consolidated the cases for the purpose of trial and ultimate disposition. After trial, the trial judge dismissed the Wichitas’ petitions on the grounds that they had lost aboriginal title to their village sites and adjacent cultivated areas by abandonment before the United States became responsible in the premises by enlargement of its territories, and had failed to establish aboriginal title at any point to all other land involved in the litigation. Because he based his ruling on these grounds, the trial judge was not required to delineate the area of the land, or to assess the role, if any, the United States played in the taking, or to establish a taking date. Although we reject the conclusion that the Wichitas failed to establish their claim of aboriginal title to any lands, we intimate no view regarding the precise dimensions of the land to which the Wichitas did hold aboriginal title or regarding the nature and date of the taking.
 

 B.
 
 The Migration of the Wichita Tribes
 

 Appellants are the present day remnants of the Wichita Confederacy, a group of confederated Indian bands that, together, constituted one of the major branches of the Caddoan linguistic family. Up until about 1800, the principal bands comprising the Wichita Confederacy were the Wichita (proper), the Taovaya, the Tawakonie, the Yscani, and the Kichai. The Yscani disappeared as a distinct band in about 1800, and the Taovaya also disappeared as a distinct band later in the 19th century, having been assimilated into the Wichita (proper).
 

 In about 1820, the Waco band was first reported as a distinct band forming part of the Wichita Confederacy. The Waco may have been an offshoot of the Tawakonie band, although some scholars believe that the term “Waco” was merely another designation for the band previously known as the Yscani.
 

 The Wichitas were Southern Plains Indians who, for centuries, had used and occupied vast areas of land in Kansas and Oklahoma. During the 16th, 17th, and 18th centuries, the Wichitas began migrating south through Oklahoma and into Texas. The Kichais, however, were not involved in this southern movement, for they were indigenous to Texas and only joined the Wichita Confederacy after this movement was underway. The lifestyle of all the Wichita bands was the same. For more than half the year they lived in permanent villages surrounded by extensive, cultivated fields. During the late fall and winter, they departed the villages en masse and lived in tepees and camps, from which they went out on hunts. Before joining the Con
 
 *1380
 
 federacy, the Kichais usually hunted in the region between the Brazos and Red Rivers in Texas; the rest of the Wichitas hunted in the Southern Plains area in Kansas and Oklahoma.
 

 Villages were sometimes clustered and sometimes scattered over large areas. Because the Wichitas produced a surplus of agricultural products and maintained permanent villages, they carried on trade with a variety of nomadic tribes as well as white traders. Over years, however, these villages separated and coalesced. The Wichitas in Kansas and Oklahoma began shifting their villages south, so that by the end of the 18th century, the Wichitas had no villages in Kansas, and by 1803, they had only two villages in southern Oklahoma. These two villages were located in the Spanish Fort area on the north bank of the Red River. In addition to these two villages, several other Wichita villages were located on the Texas side of the Spanish Fort area at this time. Although the Wichitas located their remaining villages in central and north Texas, many of them continued to hunt in Kansas and Oklahoma. Others hunted in western Texas. Non-Wichita tribes evidently hunted on the same general hunting grounds in Texas, Oklahoma, and Kansas. All but the Osage, a tribe hostile to the Wichitas, had established trading relationships with the Wichitas. The Osage, however, did not regularly hunt south of the Canadian River in Oklahoma.
 

 The United States first became responsible respecting the Wichitas as to Kansas and Oklahoma, by the Louisiana Purchase in 1803 and as to Texas, by the annexation of that country in 1845. The supposed abandonments are said to have occurred before those dates.
 

 Ill
 

 OPINION
 

 The only reasonable inference we can draw from the trial judge’s opinion and findings of fact is that the Wichitas possessed an ancestral home somewhere of some measurable dimensions. The trial judge acknowledged that the Wichitas did not abandon two villages and adjacent cultivated tracts in the Oklahoma portion of the Spanish Fort area before the United States acquired jurisdiction over that region. Yet he evidently felt that these sites were insignificant enough to ignore; he incorrectly concluded that a general abandonment by the Wichitas of perhaps
 
 most
 
 of the claimed lands in Oklahoma effectively prevented them from recovering for the loss of
 
 any
 
 lands there.
 

 The trial judge’s treatment of the claimed lands in the Spanish Fort area, however, departs from what we conceive to be the correct rules concerning aboriginal title. Although he synthesizes a vast array of vague historical data, he does not take what we deem necessary steps in his analysis of abandonment and exclusive use, and we differ with his use of the Texas land grants as decisive evidence. We cannot affirm his conclusion regarding aboriginal title to the land in the Spanish Fort area, also the other lands claimed in Texas, and the hunting grounds claimed in Texas and Oklahoma.
 

 A.
 
 Abandonment
 

 Appellee’s brief relies for the most part on the trial judge’s opinion, for appellee simply argues that ample evidence exists in the record to support the lower court’s judgment. The trial judge, however, failed to articulate some key steps in his analysis before pronouncing that the Wichitas abandoned their lands.
 

 1.
 
 Abandonment in Oklahoma
 

 The critical stage in the trial judge’s analysis of the Wichitas’ Oklahoma lands begins when he apparently agrees with the Wichitas’ contention that at one point they had held aboriginal title to certain lands in Oklahoma and Kansas:
 

 With respect to the lands in Kansas and Oklahoma on which the Wichita villages were located at different times during the 16th, 17th, and 18th centuries, and the lands in the vicinity of the villages which the Wichitas cultivated for
 
 *1381
 
 the raising of corn and other agricultural products, the [appellants] have made a sufficient showing of actual, exclusive, and continuous use and occupancy; and such use and occupancy undoubtedly continued “for a long time” in numerous instances * * *.
 

 Op. at 8.
 

 On the basis of his findings of a general Wichita movement southward from Kansas through Oklahoma, the trial judge then held that the Wichitas abandoned these lands. In his analysis, however, the trial judge omitted any discussion of why mere shifts of village sites would constitute abandonment. Although he cited three factors to explain why these shifts occurred, none of these factors show that the Wichitas discontinued their use of all the Oklahoma lands, or that another group took over the entire claimed area in Oklahoma or shared that area with the Wichitas without their consent. The three factors consisted of (1) Osage pressure, (2) disease, and (3) better trading opportunities further south. (Op. at 7.)
 

 The movement of a village site solely because of pressure from other Indian tribes does not necessarily mean that the village tribe has abandoned the land to which it holds aboriginal title. Rather, the tribe will hold title to a general area which is defined by a somewhat shifting pattern of occupancy within the general area. The Indian Claims Commission applied this view of aboriginal title in
 
 Omaha Tribes of Nebraska v. United States,
 
 4-B Ind.Cl.Comm. 627 (1957), when it held that the Omaha Tribe retained aboriginal title to the claimed lands despite the fact that that tribe moved its village from time to time. In finding No. 7, the commission noted that the Omaha tribal village occupied eleven different locations within the claimed area, customarily remained at one site no longer than 8 to 15 years, and might have moved more often on account of raids or other pressures.
 
 Omaha
 
 at 635. Finding No. 16 further emphasized that the Omahas not only would move their village as a result or in anticipation of a Dakota raid, but also may have restricted the areas of their food quests because of the dread of Dakota war parties.
 
 Omaha
 
 at 649. In addition, the commission noted that neither party disputed that the Omahas were largely without effective means of defense against these raids.
 
 Omaha
 
 at 649. In spite of all this pressure from the Dakotas and the resulting movement of the Omahas, the commission held that the Omahas did not abandon their aboriginal title to the area since they continued to use the area without any other tribe or group making permanent use of that area:
 

 * * * From time to time the village and farms were moved to different locations
 
 widely scattered over the length and breadth of the area.
 
 Throughout all these years the Omaha Tribe exploited the entire area as fully as they were able in the pursuit of game, roots, berries, and other products of the land, in the course of their customary manner by the Omaha Tribe from the time the white man first arrived until the Treaty of March 16, 1854.
 

 During these years prior to March 16, 1854, no people other than the Omaha Tribe used or occupied any part of this area for anything other than brief or temporary stays. From time to time Dakota war parties raided in the area but there is no record that the Dakota Indians, or any tribe except Omahas, ever intended or attempted to establish any residence in, or permanent use of, any parts of the area. White emigrants beginning about 1845 passed in large numbers through parts of the area, but the record is clear that no significant white settlement was made in this area until after the Treaty of March 16, 1854. For a number of years after 1835 the Otoe Tribe made its village within this area, and for a short time laid claim to a small part of this area. The Otoe village and Otoe claim were both short-lived. The Otoe had. no village in the area when the Treaty of March 16, 1854 was negotiated and did not at that time claim land within the area. Aside from these temporary incursions by other people, the Omaha
 
 *1382
 
 Tribe was at all times during this period the only tribe that was using and occupying the area.
 

 Omaha
 
 at 664-65. [Emphasis supplied.]
 

 In the case at bar, the trial judge identified the Osage as the sole human pressure exerted on the Wichitas moving them southward through Oklahoma. In fact, the Osage supplied the “principal” pressure of any sort for this move. (Op. at 6.) The trial judge, however, omitted a crucial step in his analysis of Wichita “abandonment”: he failed to cite any evidence that the Osage established permanent or semi-permanent settlements throughout the claimed Oklahoma lands, or that the Wichitas ceased using all this land or ended up sharing all portions of it with others.
 

 Without citing any such evidence, the trial judge could not then hold that the Wichitas failed to
 
 retain
 
 aboriginal title to
 
 any
 
 Oklahoma lands. The Indian Claims Commission clarified when such evidence is necessary when it distinguished
 
 Pawnee Indian Tribe of Oklahoma v. United States,
 
 5-A Ind.Cl.Comm. 224 (1957) from
 
 Quapaw Tribe of Indians v. United States,
 
 128 Ct.Cl. 45, 120 F.Supp. 283 (1954). In
 
 Pawnee,
 
 the commission rejected the government’s abandonment argument with respect to certain of the Pawnees’ claimed lands because, unlike
 
 Quapaw, Pawnee
 
 dealt with lands to which the Pawnee had already shown aboriginal title. By not introducing evidence to demonstrate how the Pawnees then lost aboriginal title, the government failed to counter the Pawnees’ claims. To the commission,
 
 Quapaw
 
 entailed a different kind of inquiry: “[there,] [w]e held in effect that the Quapaws failed to prove that they had ever occupied any part of the area ceded in 1818, except the area reserved in the treaty.”
 
 Pawnee
 
 at 292. In the present case, the trial judge stated that the Wichitas had once held aboriginal title to various tracts in Oklahoma, yet he did not adduce any evidence explaining how the Wichitas lost title to all these tracts. The United States Court of Claims faced a similar failure to adduce such evidence in
 
 Lipan Apache Tribe
 
 v.
 
 United States,
 
 180 Ct.Cl. 487 (1967).
 
 Lipan
 
 supports the proposition that when a tribunal admits that a tribe holds aboriginal title to a tract of land, that tribunal cannot dismiss the case without a showing of abandonment or extinguishment:
 

 * * * Indian title based on aboriginal possession does not depend upon sovereign recognition or affirmative acceptance for its survival. Once established in fact, it endures until extinguished or abandoned. * * * It is “entitled to the respect of all courts until it should be legitimately extinguished * *
 

 Lipan
 
 at 492. [Citations omitted.]
 

 In
 
 Osage Nation of Indians v. United States,
 
 19 Ind.Cl.Comm. 447 (1968), the Indian Claims Commission recognized that if an Indian tribe has proven that it has held aboriginal title to certain lands, the government cannot then assert that a second tribe has extinguished such title simply by demonstrating that the second tribe exerted military pressure on the first tribe. Rather, the encroaching tribe must succeed in establishing permanent settlements: “[t]he Commission has already held that raids and similar encroachments do not extinguish title where the raiders do not succeed in establishing permanent settlements.” Osage at 485. The
 
 Osage
 
 case itself established that during the period 1808 to 1825, the permanent sphere of Osage influence extended no further south than the Canadian River.
 
 [1]
 

 Osage
 
 at 478. Thus, aboriginal
 
 *1383
 
 title to one-third of the Oklahoma lands claimed by the Wichitas — the area between the Canadian and the Red Rivers — could not have been extinguished simply because Osage influence extended into Oklahoma.
 

 If, however, the Wichitas stopped using portions of this remaining one-third or were forced to share portions of this area with others, their title would be extinguished with respect to those portions. Again, it is important to note that simply because an Indian tribe relocates a village, does not necessarily imply that the former village area has been abandoned. The lower court opinion cites no evidence that the Wichitas stopped using any portion of the land to which they had had aboriginal title; the evidence only reflects a southward movement through Oklahoma.
 

 Nor do the three factors that the trial judge cited to explain this southward movement together support the conclusion that the Wichitas’ use of all these lands ceased before 1803. As demonstrated above, the principal factor (Osage pressure) fails to support a finding of no use. Nor do the influences of disease to the north and better trading opportunities to the south justify a conclusion — really just a speculation — that the Wichitas simply ceased their use of all the lands in the southern third of Oklahoma. Even though disease and resultant depopulation may have forced the Wichitas to move a village to another location, the record does not reveal that they did not continue to frequent their old haunts, hoping to resume the old time full occupancy. They would no doubt have also hoped, as people do in such circumstances, that the miracle of birth would replenish the ravages of death in their numbers. Indians have never been required to prove by current census count their right to aboriginal lands. And if better trading opportunities pulled the Wichitas southward, their historical attachment to the area around the Wichita Mountains, as found by the trial judge, findings of fact Nos. 107(d) and 120, as well as the location of their hunting grounds further north, would have given them ample reason to continue frequenting at least some of the southern third of Oklahoma. The record amply reflects that for them the emotional attraction of lands viewed by them as ancestral domain far exceeded what might have been expected of a nomadic people, which they were not.
 

 There is in fact no positive evidence to show that the Wichitas lost aboriginal title to all parts of this area by ceasing to use it, and the findings of fact actually contain numerous indications that Wichita use did not cease. Findings Nos. 101 through 110 document the easy movement of Wichita
 
 villages
 
 northward into Oklahoma after 1803; given the contact the Wichitas had with these areas before and after 1803, it seems likely that even if, for a time, no villages were located north of the Spanish Fort área, Wichita use of that northern area did not ever completely cease, nor did they or other Indians cease to view that land as Wichita land. Of course, the two villages in the Oklahoma portion of the Spanish Fort area serve as undisputed examples of continued use.
 

 In the trial court opinion, there is no indication that the judge based his conclusion that the Wichitas abandoned all their claimed lands in the southern third of Oklahoma on the belief that they were forced to share the entire area with others. Although the trial judge does state that the Wichitas shared their claimed hunting grounds with the Osage, Comanche, and Kiowa Tribes (Op. at 11), he does not identify the scope of these grounds. The Wichitas claimed vast tracts of land in Kansas and Oklahoma, and it is possible that the shared usage would not have covered the entire southern third of Oklahoma. The trial judge, however, did not delineate the areas of mutual use. In fact, the Indian Claims Commission did, in
 
 Osage,
 
 identify the southernmost limit in Oklahoma to the Osages’ hunting grounds as of 1808 (which
 
 *1384
 
 was no further south than it was in 1803): the Canadian River.
 
 Osage
 
 at 478. Additionally, the commission found that the buffalo drew the Osage primarily to the west and not to the south from their traditional hunting grounds in Missouri and northern Arkansas. A westward movement from northern Arkansas and Missouri would place the Osage north of the southern third of Oklahoma. The trial judge’s treatment of the scope of the Comanche and Kiowa use of Wichita hunting grounds is erroneous for similar reasons.
 

 2.
 
 Abandonment in Texas
 

 The trial judge also held that the Wichitas could not sustain their claim of aboriginal title to the Texas lands associated with their villages and cultivated fields because they had abandoned them before 1845 when the United States acquired jurisdiction over Texas. Again, the trial judge seems to have equated the Wichitas’ movement of village sites with an abandonment of the entire area.
 

 The trial judge described the general area in which Wichita villages in Texas were located prior to 1837:
 

 Prior to 1837, the Wichita villages in Texas shifted their locations from time to time, but, generally, the villages remained within a broad area of northern and central Texas, between the 96th meridian on the east and the 99th meridian on the west, and between the 31st parallel on the south and the Red River on the north. * * *
 

 Op. at 18-19.
 

 According to the trial judge, the Wichitas had moved their villages in a northwesterly direction out of central Texas by 1837. Although he terms this movement an “abandonment” of Wichita villages, he accepted the fact that, as of 1845, three Wichita villages still remained within the general area described above: “When Texas became a State of the United States in December 1845, the only Wichitas left in Texas consisted of a Kichai village located on the Brazos River, about 15 miles below the mouth of the Clear Fork, and Tawakoni and Waco villages situated at the mouth of the Clear Fork.” Op. at 19. Despite the fact that all three of these villages lay within the general area described by the trial judge, he still held that the Wichitas abandoned the entire bounded area. The only possible basis we can discern for this holding is that the Wichitas appeared to have moved to these sites only a few years before 1845
 
 (see
 
 findings of fact Nos. 75, 77, 79). The Wichitas, however, had moved there from sites also within the same general area. As we explained earlier in our opinion, the mere movement of village sites within a general area does not constitute abandonment. Nor can we, as also explained previously, uphold a conclusion of abandonment when it is based only on the fact that sporadic attacks on various Wichita villages and hunting parties occurred.
 

 The trial judge also asserted that the Wichitas migrated from central Texas toward the northwest mainly because of “pressure from, and hostilities with, white settlers from the United States who had moved into Texas in the 1820’s, the 1830’s, and the 1840’s.” Op. at 19. Yet his description of the western frontier of the line of white settlements in Texas as of December 1845 fails to account for the area in which the three remaining Wichita villages were located at that time. Thus, we cannot say that the Wichitas abandoned all the claimed Texas lands.
 

 B.
 
 Exclusive Use
 

 Appellants argue that the trial judge contradicted himself when he held that, because of a lack of exclusive use, the Wichitas did not establish aboriginal title to
 
 any
 
 lands outside of their villages and adjacent cultivated areas. They point out that given the findings of the existence of closely knit Wichita villages, permanent houses, and extensive communal fields, it would be inconceivable that the Wichitas did not have exclusive control of at least the areas between villages, or that they did not exclusively use some of the hunting grounds close by these villages. Appellants’ view has a great deal of merit.
 

 
 *1385
 
 While we agree with the trial judge that the Wichitas could not have had exclusive use of the greater part of the hunting grounds in Kansas, Oklahoma, or Texas, we cannot affirm his holding that the Wichitas failed to establish exclusive use of any of the hunting grounds in Oklahoma and Texas. For the reasons explained in Part III A of our opinion, we believe that the trial judge erred in his analysis of the lands to which the Wichitas established aboriginal title and then supposedly abandoned. Since the Wichitas did establish aboriginal title to some portions of land in Oklahoma and Texas, the trial judge’s delineation of the Wichitas’ shared hunting grounds is too general for us to sustain.
 

 Clearly, the northern two-thirds of Oklahoma where the Osage also hunted cannot have been used exclusively by the Wichitas. Lands continuously wandered over by adverse tribes cannot be claimed by any one of those tribes.
 
 United States v. Santa Fe Pacific Railroad Co.,
 
 314 U.S. 339, 345, 62 S.Ct. 248, 251, 86 L.Ed. 260 (1941). The sphere of Osage influence capable of disrupting the Wichitas’ exclusivity of use, however, did not extend to the southern border of Oklahoma. Two other tribes cited by the trial judge as mutual users of the Oklahoma hunting grounds — the Comanches and the Kiowas — were allies of the Wichitas, drawing close to them because of the Wichitas’ role as traders. If the Comanches and Kiowas entered Wichita territory mainly to trade with them and considered this land to be that of the Wichitas, these visiting tribes should be considered guests of the Wichitas, and their presence would not affect the Wichitas’ aboriginal title.
 
 Yakima Tribe v. United States,
 
 12-A Ind.Cl.Comm. 301, 378-79 (1963). While the Comanches and Kiowas may have ranged over large portions of the hunting grounds without any regard for the Wichitas, the closer the former two tribes came to the Wichitas’ villages, the more likely it would be that they were entering what they viewed as Wichita land. At some near enough line, the Comanche and Kiowa presence would not have impinged on the Wichitas’ exclusive use of the land.
 

 According to the trial judge, the Caddoes, Tonkawas, and Comanches shared the Wichitas’ Texas hunting grounds, located in western Texas. Again, the evidence supporting mutual use of this land is not specific enough to justify a finding of a lack of exclusive use of all the Texas lands, especially given the Wichitas’ role as traders and their friendly relationship with these tribes.
 

 C.
 
 Texas Land Grants
 

 The trial judge held as an alternate ground that the Wichitas failed to retain aboriginal title to any lands in Texas because either the government of Mexico or the Republic of Texas (while Texas was an independent sovereign) issued to white settlers land grants that included “all, or virtually all, of the Texas lands claimed by the Wichitas in this case.” Op. at 20. These land grants, however, are not in the record, and thus we cannot know whether the grants were made subject to valid existing claims or whether they undertook to extinguish prior claims. In
 
 Lipan Apache Tribe v. United States,
 
 180 Ct.Cl. 487, 492 (1967), the Court of Claims held that when extinguishment of Indian title by a prior sovereign is alleged, its intent to extinguish “must be plain and unambiguous.”
 
 See also United States v. Northern Paiute Nation,
 
 393 F.2d 786, 793 (Ct.Cl.1968). Without such information, we cannot accept the grants as evidence of any relevance. The trial judge admitted that as of December 1845, the western frontier of the line of white settlements established pursuant to these grants encroached on less than half of the Wichitas’ claimed lands: the line “extended from Corpus Christi on the Gulf Coast through San Antonio, New Braunfels, Austin, Belton, Waco, and Dallas to Preston, on the Red River, near present Denison.” Op. at 19. The issue of alleged ex-tinguishment by Texas is also dealt with in
 
 Lipan, supra.
 

 D.
 
 Problems on Remand
 

 It will probably be found that the boundaries of aboriginal title lands cannot be
 
 *1386
 
 ascertained with precision, but the former Court of Claims never held that aboriginal title did not exist on that ground. Like many other fact finding problems, it is solved by what is commonly known as a “jury verdict,” even when a jury is not involved.
 

 E.
 
 Conclusion
 

 For the reasons given in this opinion, we reverse the trial court’s dismissal of the appellants’ claims and remand to the Claims Court for a determination of the extent of aboriginal title to lands in Texas and Oklahoma, and the extent of liability of the United States, if any, for land to which the claimants had such title.
 

 REVERSED AND REMANDED.
 

 *
 

 Pursuant to order of this court dated October 4, 1982, Chief Judge Kozinski, on October 8, 1982, entered a final judgment in accordance with Senior Trial Judge White’s recommended decision of April 7, 1981.
 

 [1]
 

 . Although the 1808-1825 period occurred after the 1803 date when United States sovereignty attached in Oklahoma, the Osage movement during this later period extended further south than it did before 1803.
 
 Osage
 
 at 468. Two findings in the commission’s
 
 Osage
 
 decision should also be explained. First, the commission found that the Wichitas “were situated on Red River in the vicinity of either Spanish Fort or Ringgold, Texas” by the middle of the 18th century.
 
 Osage
 
 at 473. This finding, however, does not establish that the Wichitas’ aboriginal title was limited to the Spanish Fort area, only that their villages were situated there. Also, the Wichitas’ claim for their lands were not in issue in
 
 Osage.
 
 Second, the commission found that by 1824 it appeared that the Osage had extended war depredations to the Red River.
 
 Osage
 
 at 475. As explained above, however, attacks and raids do not extinguish aboriginal
 
 *1383
 
 title. Also, the commission stated that the date when these raids
 
 seemed
 
 to have occurred was 1824, long after the 1803 sovereignty date.